

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| THN PHYSICIANS ASSOCIATION D/B/A EL PASO PERINATOLOGY AND FREDERICK E. HARLASS, M.D., | § § § | No. 08-15-00321-CV |
| Appellants, | § | Appeal from the |
| v. | § | 448th District Court |
| MARIO A. TISCARENO AND MICHELLE R. TISCARENO, INDIVIDUALLY AND AS NEXT FRIENDS FOR A.R.T., A MINOR, | § § § | of El Paso County, Texas (TC# 2014-DCV-2484) |
| Appellees. | | |

## **O P I N I O N**

This appeal involves the sufficiency of a preliminary expert report in a medical malpractice case. Plaintiffs Mario and Michelle Tiscareno (individually, and as next friends of their daughter, A.R.T.) filed a healthcare liability claim against Dr. Frederick E. Harlass and his health care practice, THN Physicians Association. Plaintiffs claimed Dr. Harlass[1] was responsible for injuries caused to Michelle Tiscareno and their new-born daughter, A.R.T. Dr. Harlass moved to dismiss the lawsuit, contending Plaintiffs' expert report failed to meet the requirements of the Texas Medical Liability Act. The trial court denied the motion, and Dr. Harlass filed this interlocutory appeal.

---

[1] Plaintiffs' claims against THN Healthcare Associates are strictly vicarious for Dr. Harlass's alleged negligence. For purposes of clarity, we refer to Dr. Harlass and THN collectively as "Dr. Harlass."

We conclude the expert report is sufficient as to at least one theory of liability against Dr. Harlass with regard to the claims concerning Michelle Tiscareno. But, we conclude that the expert report is deficient with regard to the claims concerning A.R.T. Accordingly, we affirm in part and reverse and remand in part.

## BACKGROUND

We take the following background information from the petition and the expert report in issue, noting that the factual claims have not yet been proven.

Michelle Tiscareno was pregnant, and her baby was due in September 2012. She was under the care of Dr. Harlass beginning in January 2012. On August 2, 2012, Tiscareno was admitted to Providence Memorial Hospital where she was evaluated by Dr. Harlass, who discharged her on August 4. On August 5, Tiscareno called the hospital with unspecified complaints regarding "urination." Plaintiffs alleged Dr. Harlass was notified of Tiscareno's complaints. The next day, August 6, Tiscareno went to the hospital and was admitted at approximately 11 a.m.

According to the expert report, shortly after Tiscareno's admission, there was a "non-reassuring electronic fetal monitor strip[.]" The expert report does not indicate when the monitor strip was recorded or what made it "non-reassuring." The report also states Tiscareno's membranes ruptured during her hospital admission, and that a "foul smell" was noted. The report does not indicate when this event occurred. Dr. Harlass performed an emergency C-section that same day. The report does not indicate what time the C-section was performed. Dr. Harlass's operative notes from the C-section state there was an "extremely foul odor upon opening of the uterus[,]" and that Tiscareno's membranes were "very yellow."

2

Tiscareno was discharged from the hospital on August 8. According to the expert report, no treatment for postpartum infection was provided to Tiscareno at the time of her discharge, even though she exhibited signs of postpartum infection, including a fever, tachycardia, and leukocytosis.

Five days later, on August 13, Tiscareno went to Dr. Harlass's office, complaining of "pain in the surgical area" which was described as "hard, red, and swollen[,]" and was examined by Dr. Harlass's partner, Dr. Velazquez. According to the report, Tiscareno displayed signs of a "postpartum infection" during the visit, and Dr. Velazquez "attempted to drain the [surgical] area with a syringe, without success." The report contends Dr. Velazquez sent Tiscareno home without providing her "appropriate treatment including antibiotic therapy[.]"

The next day, while Tiscareno was at the hospital visiting her daughter, her post-operative wound ruptured "with significant fluid coming out[.]" Tiscareno was immediately admitted to the hospital for a "post-operative infected wound." The expert report does not discuss what treatment Tiscareno received after the rupture. The report merely indicates that Tiscareno was admitted to the hospital, and an infectious disease physician was consulted, who diagnosed Tiscareno with a "post-operative wound infection likely secondary to infected amniotic fluid."

**The Lawsuit**

Plaintiffs sued Dr. Harlass, Dr. Velazquez, and their medical practice, THN Physicians Association.[2] Plaintiffs alleged that while under Dr. Harlass's care, Tiscareno and her daughter A.R.T. "developed complications related to an infection." The petition alleged that as early as August 2, Dr. Harlass should have known that Tiscareno and her daughter A.R.T. were at risk for

---

[2] Dr. Velazquez also filed a motion to dismiss, which the trial court denied. Dr. Velazquez also appealed, which we considered separately in Appeal No. 08-15-00317-CV.

3

perinatal complications, and that Dr. Harlass failed to properly monitor, evaluate, and treat those perinatal complications.

## The Expert Report

As provided by statute, Plaintiffs were required to serve a complying preliminary expert report on Dr. Harlass in support of their claims.   TEX. CIV. PRAC. & REM. CODE ANN. § 74.351 (West Supp. 2016); *see also Tenet Hosps., Ltd. v. Garcia,* 462 S.W.3d 299, 302-03 (Tex.App. – El Paso 2015, no pet.).   The report was authored by Lawrence S. Borow, M.D., a board-certified obstetrician-gynecologist, with 40 years of experience.   Dr. Harlass did not raise any issues concerning Dr. Borow's qualifications.

Based on his review of the medical records, Dr. Borow opined that Dr. Harlass had breached the standard of care at three different times, causing harm to both Tiscareno and baby A.R.T.[3]

First, Dr. Borow stated, without elaboration, that Dr. Harlass should have recognized before August 6 that Tiscareno and A.R.T. "were at increased risk for chorioamnionitis."   He noted that chorioamnionitis is "an infection of the amniotic fluid, membranes, placenta an/or [sic] decidua" and "is associated with maternal infection, fetal white matter brain injury and cerebral palsy."

Second, Dr. Borow opined that on August 6, Dr. Harlass should have performed the C-section delivery earlier, and breached the standard of care because he "knew or should have known that the mother and infant were at increased risk for chorioamnionitis and morbidity."   Dr. Borow stated that by the time Tiscareno was admitted to the hospital on August 6, she "had been in

---

[3] Dr. Borow also opined that Dr. Velazquez failed to provide appropriate treatment "including antibiotic therapy when Mrs. Tiscareno presented with signs and symptoms of post-partum infection" at the August 13 office visit.

and out of threatened preterm labor for 5 days[,]" and there was a "non-reassuring electronic fetal monitor strip from shortly after admission" until the emergency C-section was performed. Dr. Borow also noted that Ticareno's membranes ruptured, and a "foul smelling fluid was noted." He asserted that "there was chorioamnionitis present upon rupture of membranes which in association with the non-reassuring EFM pattern required cesarean section delivery much sooner." Dr. Borow also noted that Dr. Harlass's operative notes stated there was "an extremely foul odor upon opening of the uterus" and "the membranes were very yellow;" and that a later "placenta pathology diagnosis stated mild to moderate acute funisitis of trivascular umbilical cord."

Finally, Dr. Borow opined that on August 8, the standard of care required Dr. Harlass to recognize that Tiscareno was at increased risk for postpartum infection due to chorioamnionitis and to provide Tiscareno with "appropriate treatment for post-partum infection including antibiotic therapy at the time of discharge." Dr. Borow noted that before her discharge, Tiscareno "showed signs and symptoms of postpartum infection including a fever, tachycardia, and leukocytosis," and that "[w]hen she was discharged, no treatment for postpartum infection was provided[,]" and she "continued having significant pain in her c-section site and in her pelvis."

As to causation, Dr. Borow opined that Dr. Harlass's failure to recognize the risk of chorioamnionitis "resulted in a delay in proper antibiotic therapy and delivery." He stated that:

> The longer the baby and the mother were exposed to infection the greater the harm, including infant white matter brain injury and maternal postpartum infection. Intrapartum antibiotic therapy is known to prevent infant morbidity and brain damage. This breach of the standard of care was a substantial cause of the infant's white matter brain injury and the mother's postpartum infection. Had Dr. Harlass complied with this standard of care, appropriate antibiotic therapy and early delivery would have more likely than not prevented the white matter brain injury and postpartum maternal infection.

5

Dr. Borow further opined that Dr. Harlass's failure to prescribe appropriate treatment to Tiscareno for postpartum infection:

> [R]esulted in progressive ongoing infection and increased morbidity, requiring additional treatment. This breach of the standard of care was a substantial cause of harm to Mrs. Tiscareno. Had Dr. Harlass complied with this standard of care, appropriate antibiotic therapy would have prevented the ongoing progressive infection requiring additional treatment.

### Objections and Motion to Dismiss

Dr. Harlass filed objections to Dr. Borow's expert report, as well as a motion to dismiss, contending that the report was conclusory as to the standard of care, breach, and causation, and therefore was inadequate to meet the requirements of the TMLA. After hearing, the trial court denied the motion.

### DISCUSSION

In two separate issues, Dr. Harlass contends the trial court abused its discretion in denying the motion to dismiss because Dr. Borow's report failed to adequately identify the standards of care, how Dr. Harlass breached those standards, and how any breach caused injury to Tiscareno and A.R.T.

### Applicable Law and Standard of Review

The TMLA defines "expert report" to mean one that "provides a fair summary of the expert's opinions" regarding (1) the standard of care, (2) how the health care provider failed to meet that standard, and (3) the causal relationship between that failure and the injury, harm, or damages claimed. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6) (West Supp. 2016); *see Scoresby v. Santillan,* 346 S.W.3d 546, 556 (Tex. 2011). A "fair summary of the expert's opinions" means that, at the least, the report must state more than mere conclusions and must

6

instead explain the basis of the expert's opinion so as to link the conclusions to the facts of the case. *See Garcia*, 462 S.W.3d at 304 (citing *American Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 878–79 (Tex. 2001)); *see also Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 52 (Tex. 2002).

Once an expert report is timely served and properly challenged, the trial court must grant a motion challenging the adequacy of an expert report if it appears to the court, after hearing, that the report does not represent an objective good faith effort to comply with the definition of an expert report. *Loaisiga v. Cerda,* 379 S.W.3d 248, 260 (Tex. 2012); *Garcia*, 462 S.W.3d at 304; *see also* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(l). To qualify as an objective good faith effort, the report must (1) inform the defendant of the specific conduct the plaintiff questions, and (2) provide a basis for the trial court to conclude that the plaintiff's claims have merit. *Scoresby,* 346 S.W.3d at 556 (citing *Palacios,* 46 S.W.3d at 879); *see also Certified EMS, Inc. v. Potts,* 392 S.W.3d 625, 630-31 (Tex. 2013).

While a claimant must timely file an adequate expert report as to each defendant in a health care liability claim, the TMLA does not require an expert report as to each liability theory alleged against that defendant. *See Tenet Hosps. Ltd. v. Bernal,* 482 S.W.3d 165, 171 (Tex.App. – El Paso 2015, no pet.). An expert report that adequately addresses at least one pleaded theory of liability satisfies the statutory requirements, and the trial court must not dismiss in such a case. *Certified EMS, Inc.,* 392 S.W.3d at 632; *see also TTHR Ltd. P'ship v. Moreno,* 401 S.W.3d 41, 44-45 (Tex. 2013).

While the claimant need not marshal all her evidence to support the expert's opinion, there must be sufficient facts within the report to meet the objectives of the statute. *Garcia*, 462

7

S.W.3d at 304 (citing *Palacios,* 46 S.W.3d at 877). In determining whether the report meets those requirements, the court should look no further than the report itself, because all of the information relevant to the inquiry must be contained within the document's four corners. *Bowie Mem'l Hosp.,* 79 S.W.3d at 52; *see also Baker v. Gomez*, 276 S.W.3d 1, 8 (Tex.App. – El Paso 2008, pet. denied). The court should not have to fill in missing gaps in a report by drawing inferences or resorting to guess work. *Garcia*, 462 S.W.3d at 304 (citing *Bowie Mem'l Hosp.,* 79 S.W.3d at 52); *see also Kanlic v. Meyer,* 320 S.W.3d 419, 422 (Tex.App. – El Paso 2010, pet. denied).

The trial court makes the decision whether an expert report is sufficient. Our role is to determine if the trial court abused its discretion. *Garcia*, 462 S.W.3d at 304 (citing *Tenet Hosp. Ltd. v. Boada,* 304 S.W.3d 528, 533 (Tex.App. – El Paso 2009, pet. denied)); *see also Jernigan v. Langley,* 195 S.W.3d 91, 93 (Tex. 2006). A trial court abuses its discretion when it acts arbitrarily or unreasonably and without reference to any guiding rules or principles. *Garcia,* 462 S.W.3d at 304; *see also Walker v. Gutierrez,* 111 S.W.3d 56, 62 (Tex. 2003).

**Whether the Report Adequately Described the Standard of Care and Breach**

In his first issue on appeal, Dr. Harlass argues that the expert report did not adequately set out the standard of care or the manner in which Dr. Harlass breached that standard. The expert report asserted three different theories on how Dr. Harlass's conduct fell below the standard of care at three different times: (1) his conduct before Tiscareno was admitted to the hospital on August 6; (2) his conduct on August 6 when he performed the emergency C-section; and (3) his conduct on August 8 when he discharged Tiscareno from the hospital. The first two involve the alleged injuries to both Tiscareno and A.R.T., while the third involves only an alleged injury to Tiscareno. We examine each of these theories separately.

8

### The Standard of Care and Breach

"'Identifying the standard of care is critical: Whether a defendant breached his or her duty to a patient cannot be determined absent specific information about what the defendant should have done differently.'" *Gonzalez v. Padilla*, 485 S.W.3d 236, 248 (Tex.App. – El Paso 2016, no pet.) (quoting *Palacios,* 46 S.W.3d at 880); *see also Clapp v. Perez*, 394 S.W.3d 254, 259 (Tex.App. – El Paso 2012, no pet.). "'While a 'fair summary' is something less than a full statement of the applicable standard of care and how it was breached, even a fair summary must set out what care was expected, but not given.'" *Padilla*, 485 S.W.3d at 248 (quoting *Palacios,* 46 S.W.3d at 880). "'Mere reference to general concepts regarding assessment, monitoring, and interventions are insufficient as a matter of law.'" *Id.* (quoting *Regent Health Care Ctr. of El Paso, L.P. v. Wallace,* 271 S.W.3d 434, 441 (Tex.App. – El Paso 2008, no pet.)).

### Events Occurring Before Tiscareno's Hospital Admission on August 6: Tiscareno and A.R.T.

Planitiffs alleged that on August 2 (when Tiscareno was first admitted to the hospital), Dr. Harlass knew or should have known that Tiscareno and her unborn infant were at risk for "perinatal complications." Dr. Borow's report, however, does not provide any insight into what Dr. Harlass knew or should have known on or about August 2. The only reference the report makes to the events leading up to Tiscareno's subsequent hospital admission on August 6 is Dr. Borow's unsubstantiated and unexplained statement that Tiscareno had been in "threatened preterm labor for 5 days" prior to her hospital admission. The report fails to explain how or why Dr. Borow arrived at that conclusion, and further fails to indicate that Dr. Harlass was even aware of that condition at any time before or during Tiscareno's hospital admission on August 6. Although Dr. Borow indicates in his report that he had reviewed Tiscareno's prenatal records, he

did not indicate that Tiscareno had any prenatal office visits or any other contact with Dr. Harlass, during those five days leading up to her admission on August 6 that would have suggested the possibility that he was aware that Tiscareno was in "threatened preterm labor" during that time.

More importantly, even if we were to assume that Tiscareno was in fact in "threatened preterm labor" for any period of time leading up to the time the emergency C-section was performed on August 6, the report fails to explain how this would have suggested to a reasonable physician that an earlier C-section was warranted or that Tiscareno and her baby were at increased risk of chorioamnionitis. Given this lack of specificity regarding the events prior to August 6, we conclude there is nothing in the expert report to suggest that Dr. Borow's conduct fell below the standard of care during the time period leading up to Tiscareno's August 6 hospital admission. Therefore, we conclude that the trial court could not have relied on this theory of liability in denying Dr. Harlass's motion to dismiss.

### Events Occurring on August 6, the Day of Tiscareno's Hospital Admission and Emergency C-Section: Tiscareno and A.R.T.

Dr. Borow's report provides more specificity with regard to the events that occurred when Tiscareno presented at the hospital at 11 a.m. on the morning of August 6. Nevertheless, a closer examination of the report reveals that Dr. Borow failed to establish that any delay in performing the C-Section actually occurred.

Dr. Borow described two separate events that occurred at the time of Tiscareno's hospital admission on August 6 which he believes would have alerted Dr. Harlass that he needed to perform an "earlier" C-section—the nonreassuring fetal monitoring strip and the rupturing of Tiscareno's membranes. Dr. Borow failed, however, to state exactly when those events occurred

10

or their temporal relation to when the C-section was performed. Instead, Dr. Borow states generally that this information was evident at 1 p.m. that day, two hours after Tiscareno was admitted, yet he fails to indicate when the C-section was performed. Dr. Borow's theory of liability rests on his conclusion that Dr. Harlass improperly delayed performing the C-section. However, without any information to substantiate that a delay even occurred, the trial court could not rely on this conclusion in denying Dr. Harlass's motion to dismiss.

Further, aside from the timing issues, Dr. Borow failed to adequately explain how Dr. Harlass knew or should have known that an earlier C-section was required. Dr. Borow asserts Dr. Harlass knew or should have known that Tiscareno was at "increased risk for chorioamnionitis" and that he failed to perform an earlier C-section in light of this risk. Dr. Borow points out two events that occurred prior to the C-section, which he claims should have alerted Dr. Harlass that an earlier C-section was indicated. Yet in both instances, he failed to provide an explanation why those events would have alerted a reasonable physician of the necessity to perform an earlier C-section. First, as to the "nonreassuring" fetal monitor strip, Dr. Borow failed to provide any description of what the fetal monitor strip indicated, or how it would have alerted a reasonable physician that an earlier C-section was necessary. Second, as to his general statements that "there was chrorioamnionitis present upon rupture of membranes" and that this was "evidence" that an earlier C-section was required, Dr. Borow fails to explain how or why he believed chrorioamnionitis was present. Instead, Dr. Borow states only, in a completely separate section of his report, that when Tiscareno's membranes ruptured, a "foul smelling fluid was noted." And, even then, Dr. Borow never explains the significance of the "foul" smell, and never states that the smell was in fact indicative of chrorioamnionitis.

11

As such, we conclude Dr. Borow has done little more than describe a set of events, without making an adequate attempt to link those facts to his conclusion that Dr. Harlass's conduct fell below the standard of care in performing the C-section. It is insufficient for an expert to merely describe facts and make general conclusions from those facts. Instead, the report must necessarily link the facts of the case to the conclusion. *Garcia*, 462 S.W.3d at 304; *see also Bowie Mem'l Hosp.*, 79 S.W.3d at 52 (the expert must "explain the basis of his statements to link his conclusions to the facts"). While no "magic words" are required to make that connection, the expert report nevertheless must make a connection between the signs and symptoms presented by the patient and what these signs would have signaled to a reasonable physician. *Mendez-Martinez*, 2016 WL 1613422, at *6 (although "magic words" are not needed in an expert report, the report must contain sufficient detail regarding a doctor's alleged breach of the standard of care).

A court may not go outside the four corners of the report and make an inference that these were signs of a treatable infection that the defendant doctor should have recognized. *See Jones v. King*, 255 S.W.3d 156, 160 (Tex.App. – San Antonio 2008, pet. denied); *see also Scoresby*, 346 S.W.3d at 556 ("No particular words or formality are required [in the expert report], but bare conclusions will not suffice."). In order to reach a conclusion that Dr. Harlass's conduct in failing to perform an earlier C-section fell below the standard of care, the trial court would have been required to make a series of impermissible inferences, *i.e.*, that there was in fact a delay in performing the C-section, that the fetal monitoring strip should have alerted a reasonable physician that an earlier C-section was required, and that the rupturing of Tiscareno's membranes would have alerted a reasonable physician that Tiscareno and A.R.T. were at increased risk for

12

chorioamnionitis.

Moreover, much of Dr. Borow's report focuses on conditions that were discovered either during or after the C-section was performed, such as the foul order Dr. Harlass noted when he opened Tiscareno's uterus, as well as the placenta pathology diagnosis the indicated funisitis in the umbilical cord and the report of the infectious disease physician diagnosed Tiscareno after her wound ruptured as suffering from a postpartum infection relating to infected amniotic fluid. An expert report must contain "a description of the circumstances confronting the doctor" at the time of treatment, which "purportedly obligated him to respond in a particular manner." *Johnson v. Willens,* 286 S.W.3d 560, 564-65 (Tex.App. – Beaumont 2009, pet. denied). The report must focus on the "clinical indicators" that would have prompted the treating physician to recognize the patient's condition and to initiate a particular treatment. *Springer v. Johnson,* 280 S.W.3d 322, 333 (Tex.App. – Amarillo 2008, no pet.). Therefore, the trial court could not have relied on any of the facts that Dr. Harlass learned during or after the C-section was performed in determining whether his conduct fell below the standard of care in failing to perform the C-section earlier.[4]

Because the expert report was deficient in this regard, the trial court could not have relied on this theory of liability to support the claims concerning the injuries to either Tiscareno or A.R.T. This is the only remaining theory that would have supported a claim that Dr. Harlass's conduct fell below the standard of care with respect to his treatment of A.R.T. Once baby A.R.T. was delivered, her care was out of Dr. Harlass's hands. Accordingly, we conclude the expert

---

[4] Planitiffs appear to assert that Dr. Harlass is complaining that Dr. Borow's expert report fails to address foreseeability. Planitiffs point out that an expert report is not required to opine on the "foreseeability" of a patient's injuries. *See Adeyemi v. Guerrero,* 329 S.W.3d 241, 245-46 (Tex.App. – Dallas 2010, no pet.) (rejecting doctor's contention the expert report was required to address whether all of a patient's injuries were foreseeable). In the present case, however, Dr. Harlass is not attempting to impose a foreseeability requirement on Dr. Borow's expert report. Instead, Dr. Harlass's argument is properly focused on the key question whether Dr. Borow's report provided a "fair summary" of the standard of care and how Dr. Harlass's conduct on August 6 fell below the standard of care.

report, in its present form, will not support any claims against Dr. Harlass for the alleged injuries to A.R.T.

However, Dr. Harlass continued to treat Tiscareno after the C-section on August 6, and her third and final theory of liability is based on Dr. Harlass's conduct occurring after that time. Thus, we address that theory with respect to Tiscareno only.

### *Tiscareno's August 8 Discharge from the Hospital: Tiscareno Only*

In his expert report, Dr. Borow contends Dr. Harlass's conduct fell below the standard of care by failing to recognize that Tiscareno was suffering from a postpartum infection at the time of her discharge, which he claims required appropriate antibiotic treatment. In his report, Dr. Borow states that before or at the time of her discharge, Tiscareno "showed signs and symptoms of postpartum infection including a fever, tachycardia, and leukocytosis."[5] Dr. Borow then concludes that Dr. Harlass should have recognized that Tiscareno was at increased risk for postpartum infection, and that he should have provided her with "appropriate treatment . . . including antibiotic therapy at the time of discharge."

Dr. Harlass first generally criticizes Dr. Borow's opinion on the ground that Dr. Borow did not clearly state how Tiscareno's "condition" in the hospital or at the time of discharge suggested that she needed "further intervention" of "how Dr. Harlass should have recognized a pending infection." According to Dr. Harlass, the report merely "rattle[d] off a list of Mrs. Tiscareno's labs and vitals," and provided no explanation which symptoms should have suggested an infection

---

[5] Dr. Borow also states that during the C-section, Dr. Harlass noted that there was "an extremely foul odor upon opening of the uterus," and that Tiscareno's membranes were "very yellow." We note however that in his report, Dr. Borow fails to expressly indicate that those were symptoms of a pending diagnosable infection, which would have prompted Dr. Harlass to initiate antibiotic therapy, and does not include them when describing Tiscareno's signs of postpartum infection. The report further states that Tiscareno continued having "significant pain in her c-section site and in her pelvis[,]" but does not indicate whether this pain occurred before or after her discharge, or whether Tiscareno reported this pain to Dr. Harlass either before or after her discharge. We therefore do not consider this in our analysis.

14

and why such symptoms should have prompted diagnosis and treatment. We disagree.

Dr. Borow expressly stated that at the time of her discharge, Tiscareno "showed signs and symptoms of postpartum infection including a fever, tachycardia, and leukocytosis." This statement represented more than a mere rattling off of a list of symptoms. Instead, the report expressly stated that these three symptoms were in fact symptoms of a diagnosable postpartum infection. Further, Dr. Borow was not required to explain which specific symptom suggested an infection, as he was instead opining that *all three* of symptoms suggested an infection. We therefore conclude Dr. Borow's report provided the necessary link between the facts described, *i.e.*, the symptoms exhibited by Tiscareno at the time of her discharge, and his conclusion that Dr. Harlass should have diagnosed and treated Tiscareno for a postpartum infection.

Dr. Harlass nevertheless contends the report was inadequate because it failed to identify what "antibiotic therapy" should have been administered to Tiscareno at the time of her discharge, and thereby does not provide fair notice of the applicable standard of care or how it was breached. In support of his argument, Dr. Harlass relies on *Ibrahim v. Gilbride,* No. 14-09-00938-CV, 2010 WL 5064430 (Tex.App. – Houston [14th Dist.] Dec. 9, 2010, no pet.) (memo op.), in which the court found the report failed to specify the medication that should have been prescribed. *Id*. at *11. *Ibrahim*, however, was not based solely on the failure to describe the type of anti-seizure medication needed to treat the patient, but discussed numerous other weaknesses not at issue in the present case, such as the failure to identify the seizure disorder suffered by the plaintiff and its pathology and to show that medication was a necessary and potentially effective treatment. *Id*. Unlike the report in *Ibrahim,* Dr. Borow's report adequately identified the type of infection that Tiscareno was suffering from at the time of her discharge (*i.e.*, a postpartum infection), identified

15

the pathology of the infection (*i.e.*, an untreated postpartum infection stemming from infected amniotic fluid), and expressly stated that appropriate antibiotic therapy would have been effective in preventing the ongoing infection. More importantly, *Ibrahim* dealt with much more complex questions regarding the nature of ongoing seizures, whether those seizures could be treated or controlled, and if so, what type of treatment would be effective to accomplish that task—a much more arcane topic than the typically less complex question whether an infection may be treated with appropriate antibiotics. *See, e.g., Mendez-Martinez,* 2016 WL 1613422, at *6 (the level of detail required in an expert report will depend, in part, on the complexity of the case, with more complex cases requiring more detail).

Numerous courts have found expert reports to be adequate when the report merely states that a physician's failure to treat a patient suffering from an otherwise treatable infection with antibiotics was a substantial cause of the patient's injuries, without imposing any requirement that the report specify the exact type of antibiotic therapy the treating physician should have used. *See, e.g., Van Ness v. ETMC First Physicians,* 461 S.W.3d 140, 144 (Tex. 2015) (report was adequate where it referred only to the need to treat the patient's illness with "antibiotics"); *Nexion Health at Terrell Manor v. Taylor*, 294 S.W.3d 787, 796 (Tex.App. – Dallas 2009, no pet.) (expert report was adequate where it simply indicated that patient's condition was treatable with proper antibiotics); *Romero v. Lieberman,* 232 S.W.3d 385, 391 (Tex.App. – Dallas 2007, no pet.) (expert report was adequate where it stated that the patient should have been given antibiotic treatment for his infection); *Spitzer v. Berry,* 247 S.W.3d 747, 752 (Tex.App. – Tyler 2008, pet. denied) (expert report was adequate where it stated that the defendant doctor was required to "maintain antibiotic therapy" in a post-surgical patient); *see also Lakshmikanth v. Leal,* No. 13-08-00389-CV, 2009

16

WL 140741, at *3 (Tex.App. – Corpus Christi Jan. 22, 2009, pet. denied) (mem. op.) (expressly rejecting the doctor's argument that expert report was required to identify the type of antibiotics that should have been prescribed to prevent infection).

There may be unique or unusual situations in which it would be necessary for an expert report to identify the type of antibiotic that would have been effective to treat a certain type of infection, such as when the report indicates that the infection is known to be resistant to antibiotics, or situations in which a report is claiming that an antibiotic could have been expected to work in a short period of time. However, we do not find that any unique or unusual circumstances are present here. Dr. Borow's report was sufficient to put Dr. Harlass on notice of the conduct being called into question, and to provide the trial court with sufficient information to conclude that Tiscareno's claim that Dr. Harlass breached the standard of care by allegedly failing to provide her with antibiotics at the time of discharge had merit.

**Whether the Expert Report Provided an Adequate Opinion on Causation**

In his second issue on appeal, Dr. Harlass contends Dr. Borow's opinion on causation is inadequate, because it is conclusory and fails to set out a causal connection between Dr. Harlass's alleged breach of the standard of care and the alleged injuries to both Tiscareno and A.R.T.

*The Adequacy of a Causation Opinion*

An expert report must provide information linking the defendant's purported breach of the standard of care to the plaintiff's injury. *Garcia,* 462 S.W.3d at 310 (citing *Bowie Memorial Hospital,* 79 S.W.3d at 53). The report may not have an "analytical gap" or a "missing link" between the expert's allegation that the physician defendant breached the standard of care and the plaintiff's injuries. *See Clark v. HCA, Inc.,* 210 S.W.3d 1, 11 (Tex.App. – El Paso 2005, no pet.).

17

A court may not fill in missing gaps by drawing inferences or guessing what the expert likely meant or intended, nor may we infer causation. *Garcia,* 462 S.W.3d at 310 (citing *Bowie Mem'l Hosp.,* 79 S.W.3d at 52); *see also Castillo v. August,* 248 S.W.3d 874, 883 (Tex.App. – El Paso 2008, no pet.) (causation cannot be inferred; it must be clearly stated). A "fair summary" of causation must include an articulable, complete, and plausible explanation of how the alleged breach led to the damages sustained. *See Garcia,* 462 S.W.3d at 308.

In medical malpractice cases, "plaintiffs are required to adduce evidence of a 'reasonable medical probability' or 'reasonable probability' that their injuries were caused by the negligence of one or more defendants, meaning simply that it is 'more likely than not' that the ultimate harm or condition resulted from such negligence." *Jelinek v. Casas,* 328 S.W.3d 526, 532-33 (Tex. 2010) (citing *Kramer v. Lewisville Mem'l Hosp.,* 858 S.W.2d 397, 399–400 (Tex. 1993)). Statements based on reasonable medical probability, without explanation and without tying the conclusions to the facts, are not sufficient. *Id.* at 539. Instead, "the expert must go further and explain, to a reasonable degree, how and why the breach caused the injury based on the facts presented." *Id*. at 539-40. "While a claimant is not required to conclusively prove her case through a preliminary expert report, the report may not merely state conclusions about any of the elements." *Castillo v. August*, 248 S.W.3d 874, 883 (Tex.App. – El Paso 2008, no pet.) (report was inadequate where one-sentence statement on causation only generally alleged that the physician's actions were the cause of the patient's subsequent condition).

We analyze separately the questions whether Dr. Borow's causation opinions were adequate to support the claims concerning A.R.T. and the claims concerning Tiscareno.

***Causation Analysis: A.R.T.***

18

Dr. Harlass contends Dr. Borow's report is inadequate in several respects with regard to the causation of A.R.T.'s injuries. We agree. Dr. Borow's causation opinion concerning how Dr. Harlass's breach resulted in injury to A.R.T. is conclusory and does not adequately link his conclusions to the facts.

Dr. Borow's causation opinion as to A.R.T. is premised on the conclusion that A.R.T. suffered brain damage from being exposed to chorioamnionitis in utero before and during delivery. However, missing from Dr. Borow's report is any clear statement that Tiscareno was in fact actually suffering from chorioamnionitis before or during her delivery. As set forth above, throughout his report, Dr. Borow indicates only that Tiscareno was at "increased risk for chorioamnionitis," and he makes no express statement that Tiscareno was ever in fact diagnosed with chorioamnionitis. There is only one point in his report where Dr. Borow arguably comes close to making an assertion that Tiscareno did in fact have chorioamnionitis, when he states there was "evidence" of chorioamnionitis in Tiscareno's membranes at the time they ruptured. However, as set forth above, Dr. Borrow never explains how he made the determination that chorioamnionitis was "present." We therefore conclude the trial court not reply on this statement in concluding that Tiscareno did in fact suffer from chorioamnionitis before or during the C-section.[6]

Further, while the report indicates Tiscareno was later diagnosed with a postpartum infection, Dr. Borow does not indicate how this postpartum infection was related to the alleged existence of chorioamnionitis before or at the time the C-section was performed. Without any

---

[6] At one point in his report, Dr. Borow states that on or before August 8, 2012, Dr. Harlass failed to recognize that Tiscareno was at an "increased risk for post-partum infection due to chorioamnionitis." While this statement could possibly suggest Dr. Borow believed that Tiscareno suffered from chorioamnionitis, he failed to make any express statement to that effect in his report.

19

express statement that Tiscareno was in fact suffering from chorioamnionitis at the time of her delivery, in order to conclude that A.R.T. was injured due to exposure to chorioamnionitis in utero, the trial court would have had to make an impermissible inference that Tiscareno was in fact suffering from chorioamnionitis at the time of her delivery.

Moreover, even if we were to assume that A.R.T. was in fact exposed to chorioamnionitis before or during delivery, Dr. Borow's causation opinion suffers from some of the same deficiencies as his opinion regarding the breach of the standard of care. In particular, Dr. Borow's report makes various general statements regarding how, in theory, exposure to chorioamnionitis may affect an unborn infant. For example, Dr. Borow states in general terms that "[c]horioamnionitis is associated with maternal infection, fetal white matter brain injury and cerebral palsy," and that "[t]he longer the baby and the mother were exposed to infection the greater the harm, including infant white matter brain injury and maternal postpartum infection." Dr. Borow makes virtually no attempt, however, to correlate these statements with the facts in this case, and his general theoretical statements regarding the association between exposure to chorioamnionitis raise more questions than they answer.

While there is no requirement that an expert report describe all biological process involved in the onset of the injury, the expert must at a minimum explain the connection between doctor's conduct and the injury to the patient. *See Jelinek,* 328 S.W.3d at 540; *Palacios,* 46 S.W.3d at 879; *Bowie,* 79 S.W.3d at 53. Unlike the simple question whether a patient suffering from an infection should be given antibiotics, the question of how exposure to chorioamnionitis in utero affects an infant is a more complicated question, which requires more medical explanation before a connection may be made between Dr. Harlass's alleged delay in performing the C-section and

20

A.R.T.'s alleged brain injuries.

This problem, in large part, harkens back to Dr. Borow's failure to provide any timeline from which the trial court could have determined how long Dr. Harlass actually delayed in performing the C-section. This missing information is critical to the question of causation, because it is virtually impossible to know whether exposure to chorioamnionitis during this unknown period of delay could have in fact caused A.R.T.'s brain injuries. Similarly missing from Dr. Borow's report is any indication of how long an unborn baby would have to be exposed to chorioamnionitis before brain damage would likely occur. The report provides no insight into the rate at which a brain injury may develop, *i.e.,* whether the process takes weeks, days, hours, or minutes, and more importantly whether the time period of the alleged delay was long enough to be significant in this process. In order to conclude that the delay contributed to A.R.T.'s brain injury, the trial court would have had to make an impermissible inference that the delay in performing the C-section could have contributed to A.R.T.'s brain injury, without having any information regarding how long the delay was or how long it takes for a baby to develop a brain injury under these circumstances. The trial court would have been required to speculate that the process of developing a brain injury can occur rather quickly, or alternatively that the delay in performing the C-section was long enough for that process to occur. The trial court was not permitted to engage in any such conjecture; instead, the expert report itself was required to furnish that link. *See Bowie Mem'l Hosp.,* 79 S.W.3d at 53 (the expert report must contain sufficient facts explaining the expert's conclusions and must show causation beyond mere conjecture); *Jones v. King,* 255 S.W.3d 156, 160 (Tex.App. – San Antonio 2008, pet. denied) (court was not entitled to infer that an alleged delay in diagnosis caused the patient additional pain and suffering, as it was

21

"not permitted to rely on such speculation in determining the adequacy of the report"); *see also Garcia*, 462 S.W.3d at 310 (chronicling various cases in which a link in the chain of causation was completely missing).

We conclude Dr. Borow's opinion on causation as to A.R.T.'s injuries is too conclusory to meet the requirements of the TMLA *See, e.g., Jelinek,* 328 S.W.3d at 539–40 (expert's conclusion that a hospital's failure to provide antibiotics to a patient within a reasonable medical probability caused increased pain and suffering and a prolonged hospital stay was inadequate where it "offer[ed] no more than a bare assertion" that the hospital's failure resulted in those injuries); *Ngo v. Lewis,* No. 09-10-00140-CV, 2010 WL 3518225, at *2 (Tex.App. – Beaumont Sept. 9, 2010, no pet.) (expert report was inadequate where it made a conclusory statement that an approximate two-hour delay in providing a newborn infant who had been exposed to streptococcus bacteria during labor was the proximate cause of the infant's death over a week later without providing adequate explanation of how the alleged delay in the infant's treatment was a substantial factor that caused his death or otherwise lowered his chances of survival); *Jones v. King*, 255 S.W.3d 156, 160 (Tex.App. – San Antonio 2008, pet. denied) (expert report on causation was inadequate where it offered no medical explanation regarding whether earlier treatment would have been effective in shortening the duration of the patient's meningitis, precluding additional pain and suffering, or preventing other alleged injuries and damages).

### *Causation Opinion: Tiscareno*

As determined above, Dr. Borow's expert report provides a basis for supporting only one of Tiscareno's theories of liability, *i.e.,* Dr. Harlass failed to prescribe antibiotic therapy to Tiscareno at the time of her discharge from the hospital on August 8. Therefore, we will analyze

22

whether Dr. Borow's report provides an adequate causation opinion with regard to that particular theory of liability.

In his expert report, Dr. Borow expressly stated that before Tiscareno's discharge from the hospital, she exhibited signs and symptoms of postpartum infection, including fever, tachycardia, and leukocytosis, which required antibiotic therapy, but that "no treatment for postpartum infection was provided." On the issue of causation, Dr. Borow further opined that:

> Dr. Harlass' failure to prescribe appropriate treatment for postpartum infection resulted in progressive ongoing infection and increased morbidity, requiring additional treatment. This breach of the standard of care was a substantial cause of harm to Mrs. Tiscareno. Had Dr. Harlass complied with this standard of care, appropriate antibiotic therapy would have prevented the ongoing progressive infection requiring additional treatment.

Dr. Harlass contends that Dr. Borow's causation opinion was vague and conclusory because in order to find a causal link, the trial court would have been required to infer that Tiscareno "probably had a post-partum infection on August 8, 2012" at the time of her discharge, and that her postpartum infection required "additional or different treatment than what she received[.]" We conclude no such inference was required.

The report in this instance clearly identifies Tiscareno's condition (a postpartum infection), the signs and symptoms that Tiscareno displayed that should have alerted Dr. Harlass that she was suffering from this condition (fever, tachycardia, and leukocytosis), and the treatment that Dr. Harlass could have initiated to prevent the "ongoing progressive infection requiring additional treatment." As explained above, numerous courts have found the expert report to be adequate based on similar statements that a patient was suffering from a diagnosable infection for which antibiotic therapy would have been effective. *See, e.g., Van Ness,* 461 S.W.3d at 144; *Nexion Health at Terrell Manor*, 294 S.W.3d at 796; *Romero,* 232 S.W.3d at 391; *Spitzer,* 247 S.W.3d at

23

752. We similarly conclude that Dr. Borow's report sufficiently complied with the requirements of the TMLA.

Dr. Harlass also criticizes Dr. Borow's report for failing to describe in detail the "additional treatment" that Tiscareno received as the result of her ongoing infection. Dr. Harlass provides no authority for his proposition that an expert report must provide a detailed description of the type of treatment a patient may have received as the result of her injuries, and we know of none. Further, we note that although his report is not a model of clarity, Dr. Borow did make a good faith effort to explain the nature of the injuries suffered by Tiscareno. In particular, Dr. Borow states that Dr. Harlass's failure to properly diagnose and treat Tiscareno with appropriate antibiotic therapy at the time of her discharge led to an "ongoing" infection, which ultimately resulted in Tiscareno's surgical wound rupturing six days later, and which required her admission to the hospital, as well as a consultation with an infectious disease specialist. This was sufficient to provide Dr. Harlass with fair notice of the general nature of the injuries Plaintiffs believed resulted from his allegedly negligent acts. *See Palacios,* 46 S.W.3d at 879 (expert report need not be formal and its information need not meet the evidentiary requirements of a summary judgment proceeding or at trial); *see also Spitzer,* 247 S.W.3d at 750 (a "fair summary" in an expert report is "something less than a full statement" of the applicable standard of care, how it was breached, and how that breach caused the injury").

At this early stage in the proceedings, a plaintiff "need not drill down into every possible detail in every case in order to survive dismissal[.]" *Mendez-Martinez,* 2016 WL 1613422, at *6.

### Remand for Opportunity to Amend

With regard to the claims concerning Tiscareno's injuries, we find that the expert report

24

was adequate to support Plaintiffs' theory that Dr. Harlass's conduct fell below the standard of care by failing to properly diagnose and treat Tiscareno's postpartum infection at the time of her discharge from the hospital on August 8. Because the plaintiff in a healthcare liability suit need only provide an adequate expert report on one theory of liability, we therefore conclude that the trial court did not abuse its discretion in denying Dr. Harlass's motion to dismiss concerning Tiscareno's claims. *See Certified EMS, Inc.,* 392 S.W.3d at 632 (an expert report that adequately addresses at least one pleaded liability theory satisfies the statutory requirements, and the trial court must not dismiss in such a case); *Bernal,* 482 S.W.3d at 171 (while a claimant must timely file an adequate expert report as to each defendant in a health care liability claim, the TMLA does not require an expert report as to each liability theory alleged against that defendant).

With regard to the claims concerning A.R.T.'s injuries, we conclude the trial court abused its discretion in denying the motion to dismiss. However, because Plaintiffs have not been given an opportunity to cure any deficiencies in Dr. Borow's report, and because their report is not so deficient as to constitute no report at all, we remand for the trial court to consider granting a thirty-day extension to allow Plaintiffs to attempt to cure the deficiencies in the report with regard to those claims.[7] *See Tenet Hosps. Ltd. v. De La Riva,* 351 S.W.3d 398, 407-08 (Tex.App. – El Paso 2011, no pet.) (upon finding that trial court abused its discretion in denying the defendant doctor's motion to dismiss, proper course of action was to remand the case to the trial court for consideration of whether the deficiencies could be cured, and therefore, whether to grant an extension of time) (citing *Leland v. Brandal,* 257 S.W.3d 204, 207-08 (Tex. 2008)); *see also Lewis v. Funderburk,* 253 S.W.3d 204, 208 (Tex. 2008) (stating that a deficient report may be cured by

---

[7] When a timely-filed expert report is deficient, the trial court may grant one thirty-day extension to cure the deficiencies, unless it is objectively shown that the report was not filed in good faith, at which point, dismissal is required. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(c).

25

amending the report or by serving a new report from a separate expert that cures the deficiencies in the previously filed report). In doing so, we note that the trial court "should be lenient in granting thirty-day extensions and must do so if deficiencies in an expert report can be cured within the thirty-day period." *Bernal,* 482 S.W.3d at 176 (citing *Scoresby*, 346 S.W.3d at 554).

## CONCLUSION

We affirm in part the trial court's order denying the motion to dismiss with regard to the claims concerning Tiscareno's injuries, and reverse in part the trial court's order denying the motion to dismiss with regard to the claims concerning A.R.T.'s injuries and remand for further proceedings in accordance with our opinion.

STEVEN L. HUGHES, Justice

August 17, 2016

Before McClure, C.J., Rodriguez, and Hughes, JJ.

26