COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



| | | |
|---|---|---|
| JOSE IGNACIO MENDEZ-MARTINEZ, M.D., | § | |
| | § | No. 08-15-00265-CV |
| Appellant, | | |
| | § | Appeal from the |
| v. | | |
| | § | 205th District Court |
| ANDRES G. CARMONA, Individually, On Behalf of All Wrongful Death | § | of El Paso County, Texas |
| Beneficiaries, and as Personal Representatives of the ESTATE OF | § | (TC# 2012-DCV04858) |
| ROSARIO M. CARMONA, Deceased, | | |
| | § | |
| Appellee. | | |

# **O P I N I O N**

Six days after being admitted to Sierra Providence Hospital in El Paso with atrial fibrillation, Rosario Carmona died of cardiac arrest. Her husband Andres sued the Hospital, attending physician Dr. Jose Ignacio Mendez-Martinez, and Dr. Mendez-Martinez's practice group Cardiology Care Consultants for medical malpractice, alleging among other things that Dr. Mendez-Martinez's failure to transfer Carmona from the Hospital's general wing to the intensive care unit for more frequent nursing care and monitoring resulted in the missing of certain medical warning signs that could have altered the course of her treatment and prevented her death.

As required by the Texas Medical Liability Act, Andres Carmona submitted an expert

report from Dr. Louis Roddy certifying that this case was not frivolous. The parties agreed that Dr. Roddy's initial report did not meet the Act's formal requirements, and the trial court granted leave to supplement. Upon receipt of the second report, the trial judge decided that Dr. Roddy's supplementation was detailed enough to sufficiently appraise him that the case against the healthcare providers was not wholly frivolous and should move into the discovery phase.

Only Dr. Mendez-Martinez appealed that decision. By two issues, he asks this Court to reject Dr. Roddy's report and dismiss this case with prejudice, contending that the report was too vague and conclusory to allow the trial court to conclude that this case should move forward.

We will affirm.

## BACKGROUND

On November 9, 2012, after filing suit, Andres Carmona filed Dr. Roddy's expert report. Per his report, Dr. Roddy understood the facts to be as follows: Rosario Carmona arrived at Sierra Medical Center on May 1, 2010, complaining of shortness of breath, productive cough, lower back pain, and generalized weakness. She was diagnosed with atrial fibrillation, a left bundle branch block, bronchitis, asthma, chronic obstructive pulmonary disease, possible deep vein thrombosis, prerenal azotemia, hyperlipidemia, hypertension, anemia, and osteoporosis.

On May 7, 2010, at 8 p.m., a floor nurse in the Hospital's general wing noticed that Carmona's heart rate was over 100 beats per minute. The nurse informed Dr. Mendez-Martinez, who ordered treatment with Cardizem. At 10 p.m., the nurse administered 30 milligrams of Cardizem. At 10:30 p.m., Carmona's heart rate was still over 100. Dr. Mendez-Martinez ordered the nurse to administer a Cardizem drip at a rate of five milligrams per hour. The Cardizem drip began at 11 p.m. Between 8 p.m. and midnight, Carmona's blood pressure was recorded at 131/97. At 12:01 a.m. on May 8, the nurse noted that Carmona's pulse was still over

2

100 and that she had a rapid ventricular rate. At 2:10 a.m., Carmona's heart rate was still in the 100's.

At 4 a.m., the nurse noted that Carmona's pulse was in the 80's and 90's, and her blood pressure had dropped to 98/55. At 4:30 a.m., Carmona's nurse found her with a heart rate in the 40's. The nurse discontinued the Cardizem drip without notifying Dr. Mendez-Martinez, and Carmona's heart rate returned to the 80's and 90's range. At 5 a.m., Carmona's heart rate returned to the 100's range. At 7:14 a.m., following a gap in the medical records, Carmona was found without a pulse, and staff initiated CPR. At 7:40 a.m., resuscitation efforts ceased and Carmona was pronounced dead.

In his initial report, Dr. Roddy made the following findings:

20. The patient's atrial fibrillation with rapid ventricular response and left sided bundle branch block placed the patient at risk for death due to cardiac arrest, which Dr. Mendez-Martinez and the hospital nurse knew or should have known.

21. When the patient's heart rate increased to over 100 at 8:00 PM on May 7, the standard of care included the following:

   a. that the physician, Dr. Mendez-Martinez, transfer the patient to an ICU for more frequent monitoring including vital signs, blood gases, and neurological status;

   b. that the nurse assess the patient's vital signs and saturations at least every 30 minutes and document the findings, and

   c. that the physician be at the bedside to attend the needs of a patient with an acute change in clinical status.

22. The breach of the standard of care included the following:

   a. the physician, Dr. Mendez-Martinez, failed to transfer the patient to an ICU for more frequent monitoring including vital signs, blood gases, and neurological status;

   b. the nurse failed to assess the patient's vital signs and saturations at least every 30 minutes and document the findings, and

3

c. the physician, Dr. Mendez-Martinez, failed to be at the bedside to attend the needs of a patient with an acute change in clinical status.

The report also stated that when the patient developed bradycardia and her heart rate dropped down into the 40's, the nursing standard of care required the floor nurse to notify the physician of acute change of clinical status and assess the patient's vital signs at least every thirty minutes and document the findings. Dr. Roddy concluded his report by stating:

25. Had the standard of care been followed, the patient would have received treatment for rhythm control (amiodarone, sotalol, or dofetilide), or rate control (with beta blockers), which would have, more likely than not, prevented hemodynamic instability, and prevented the severe bradycardia, the cardiac arrest and death.

26. The failure to adhere to standards of care as applied to this patient did, to a reasonable medical probability, result in respiratory depression, cardiac arrest and death, which - in the absence of such failure of adherence to medical standards - would have not have occurred.

Dr. Mendez-Martinez objected to the report, arguing that it was conclusory as to causation. The trial court then entered an agreed order sustaining the objection as to causation and providing Carmona with thirty days to cure the deficiencies. Carmona then timely filed a supplement from Dr. Roddy "explaining how Dr. Mendez-Martinez's breach of the standard of care was a substantial cause of the patient's cardiac arrest." Dr. Roddy opined that "had Dr. Mendez-Martinez transferred Mrs. Carmona to ICU for more frequent monitoring including vital signs, blood gases, and neurological status, the ICU nursing staff, more likely than not, would have noted a significant change of these values and recognized that these may be signs of hemodynamic instability (oxygen deprivation). Such signs would have been immediately reported to the physician." Dr. Roddy further stated:

2. ICU nurses are trained to understand that atrial fibrillation (AFib) may lead to heart failure. Heart failure means the heart is not pumping enough blood to meet the body's needs. AFib can lead to heart failure because the heart is beating so

4

fast that it never properly fills up with blood to pump out to the body. As a result, when the heart does not efficiently pump the blood forward with strong contractions, symptoms develop because blood can 'back up' in the pulmonary veins (the vessels that return oxygen-rich blood from the lungs to the heart) which can cause fluid to back up into the lungs. This results in a significant change of vital signs, blood gases, and neurological status which the nurses are trained to recognize and report to the physician.

.    .    .

4. At 4:00 AM, the standard of care would have required that the ICU nursing staff immediately report the significant change of blood pressure to the physician.

5. Once reported to the physician, the standard of care would have required that the physician order immediate administration of medications for rhythm control (amiodarone, sotalol, or dofetilide), or rate control (with beta blockers).

6. In addition, once the significant change of vital signs (systolic pressure under 100 and heart rate down to the 40's) were reported to the physician, the standard of care required that the physician, within 30 minutes, be at the bedside to attend the needs of a patient because of the acute change in clinical status.

7. The administration of the medications . . . would have controlled the atrial fibrillation and prevented the hemodynamic instability. These medications would have prevented the severe bradycardia such as the 4:30 AM bradycardia (heart rate in the 40's).

8. By controlling the hemodynamic instability, more likely than not, this would have prevented Mrs. Carmona's 7:14 AM cardiac arrest and death.

9. ICU nursing's frequent monitoring (at least every 30 minutes) of vital signs, blood gases, and neurological status, would have noted a deterioration of the patient's condition which would have been reported to the physician.

10. After 5:00 AM and prior to the arrest at 7:14 AM, her condition deteriorated (vital signs, blood gases, and neurological status), which would have been recognized by ICU nursing staff and reported to the physician. The physician would have ordered immediate treatment to prevent hemodynamic instability caused by AFib. Such medical treatment including cardioconversion, more likely than not, would have prevented her cardiac arrest and death.

11. In summary, the standard of care included that Dr. Mendez-Martinez transfer Mrs. Carmona to the ICU by 10:30 PM on 5/7/2010, that Dr. Mendez-Martinez breached this standard of care, that the standard of care been followed [sic], Mrs. Carmona's deterioration would have been recognized and treated, which would of [sic] prevented her cardiac arrest and death. Thus, the breach of the standard of

5

care was a substantial cause of Mrs. Carmona's cardiac arrest and death.

## DISCUSSION

Dr. Mendez-Martinez argues that Dr. Roddy's expert report accusing him of malpractice is deficient in two ways. First, in Issue One (a), Dr. Mendez-Martinez contends the report fails to articulate a sufficient causal link between his failure to order Carmona to the ICU and Carmona's death. Second, in Issue One (b), Dr. Mendez-Martinez asserts that the report is defective because it did not adequately explain to what extent his alleged negligence, as opposed to the negligence of the nursing staff, caused Carmona's death. We address these issues in reverse order.

### *Standard of Review and Applicable Law*

In response to a perceived medical malpractice crisis in Texas, the Legislature passed the Texas Medical Liability Act in 2003, which created a new set of pretrial procedures aimed at allowing health care providers to test a broad class of "healthcare liability claims" for frivolousness at the pleading stage. *See generally* TEX.CIV.PRAC.&REM.CODE ANN. §§ 74.001–.507 (West 2011 & West Supp. 2015); *Tex. W. Oaks Hosp., L.P. v. Williams*, 371 S.W.3d 171, 177 (Tex. 2012)(describing TMLA's legislative history). The Legislature also provided for interlocutory review of these pretrial orders, TEX.CIV.PRAC.&REM.CODE ANN. § 51.014(a)(9)(West Supp. 2015), and in the ensuing years, a growing body of law interpreting the exact scope of the TMLA has begun to emerge, though the precise contours of these pretrial procedures are still being defined by appellate courts throughout the State of Texas. *See Loaisiga v. Cerda*, 379 S.W.3d 248, 263-64 (Tex. 2012)(Hecht, J., concurring in part, dissenting in part)(noting that while the Legislature passed the TMLA in an attempt to reduce litigation costs, "disagreements over the Act's expert report requirement . . . have resulted in protracted

pretrial proceedings and multiple interlocutory appeals, threatening to defeat the Act's purpose . . . .").

As is relevant here, the TMLA requires plaintiffs who sue doctors and hospitals for healthcare liability claims such as medical malpractice to provide the trial court with a sufficiently detailed expert report that essentially certifies the merit of the plaintiff's claim within 120 days of filing the original petition. TEX.CIV.PRAC.&REM.CODE ANN. § 74.351(a)(West Supp. 2015). "A valid expert report under the TMLA must provide: (1) a fair summary of the applicable standards of care; (2) the manner in which the physician or health care provider failed to meet those standards; and (3) the causal relationship between that failure and the harm alleged." *TTHR Ltd. P'ship v. Moreno*, 401 S.W.3d 41, 44 (Tex. 2013); TEX.CIV.PRAC.&REM.CODE ANN. § 74.351(r)(6). If an expert report filed timely and in good faith is nevertheless formally deficient, the trial court may grant one thirty-day extension to cure the deficiency. TEX.CIV.PRAC.&REM.CODE ANN. § 74.351(c). The bad-faith filing of an initial report or the filing of a second report that fails to cure deficiencies in an initial good-faith report results in mandatory dismissal of the plaintiff's claim. TEX.CIV.PRAC.&REM.CODE ANN. §§ 74.351(b)(2) & (c).

The purpose of the TMLA's expert report requirement is both to place healthcare providers on notice of what specific conduct is at issue in a particular case, and to provide judges who may have no medical training or knowledge of healthcare administration with the information needed to determine whether a healthcare liability claim is wholly frivolous. *Clapp v. Perez*, 394 S.W.3d 254, 258 (Tex.App.--El Paso 2012, no pet.). The Legislature's intent in passing the TMLA was to ensure healthcare providers did not expend resources defending against facially frivolous suits while also protecting a plaintiff's right to redress. *Scoresby v.*

*Santillan*, 346 S.W.3d 546, 554 (Tex. 2011). The Act was not intended to create a procedural minefield by which colorable medical malpractice claims are lost through attrition. *Id*.

### *Improper Collectivization of Defendants*

We deal first with Dr. Mendez-Martinez's contention that Dr. Roddy's report is defective because it improperly collectivizes the negligence allegations against the defendants. Specifically, Dr. Mendez-Martinez argues that Dr. Roddy essentially failed to assign comparative amounts of blame between Dr. Mendez-Martinez and the floor nursing staff, and Dr. Mendez-Martinez maintains that without specifying to what extent his own alleged negligence contributed to Carmona's death in light of the Hospital nursing staff's negligence, the report is inadequate. This argument is without merit.

Where a plaintiff sues multiple defendants in a health care liability case, the expert report must delineate the standards of care applicable to each defendant and then explain how the defendants' respective breaches of those standards of care are causally linked to the plaintiff's injury. *Tenet Hosps., Ltd. v. Love*, 347 S.W.3d 743, 753 (Tex.App.--El Paso 2011, no pet.); *Taylor v. Christus Spohn Health Sys. Corp.*, 169 S.W.3d 241, 244 (Tex.App.--Corpus Christi 2004, no pet.). An expert's bare, collectivized accusations of negligence against multiple defendants are insufficient to meet the TMLA's requirements; the expert must either individually distinguish the defendants from one another or else explain why all defendants are subject to the same standard of care. *Love*, 347 S.W.3d at 753; *Gonzalez v. Padilla*, No. 08-14-00286-CV, 2016 WL 815449, at *7-*8 (Tex.App.--El Paso Mar. 2, 2016, no pet.h.).

Here, Dr. Roddy's report clearly delineates how the responsibilities for patient care were divided between Dr. Mendez-Martinez and the nursing staff. Specifically, he states that the standard of care required Dr. Mendez-Martinez to transfer the patient to the ICU for more

frequent monitoring, and to come to the patient's bedside when there was an acute change in clinical status. Dr. Roddy also opines that the standard of care required nursing staff to assess the patient's vital signs and saturations at least every thirty minutes and document the findings, and to notify Dr. Mendez-Martinez when Carmona developed bradycardia. Rather than improperly collectivizing different parties under a single standard of care, Dr. Roddy's report explains the divided responsibilities of the cardiologist and the nursing staff and how each purportedly breached the standard of care. *Compare Clapp*, 394 S.W.3d at 259-60 (report insufficient because it failed to explain differing roles of and standards of care applicable to anesthesiologist and surgeon in gastric bypass surgery).

Dr. Mendez-Martinez's claim that an expert must not only delineate how the defendants breached their respective standards of care but also assign relative negligence percentages among the defendants to survive dismissal is untenable. In the first place, Dr. Mendez-Martinez cites no specific authority to support this argument, and we have found no authority suggesting the TMLA requires an expert to assign relative amounts of blame to different defendants. On the contrary, we have previously held that at the TMLA pleading stage, "[a] causal relationship is established by proof that the negligent act or omission was *a substantial factor* in bringing about the harm[.]" [Emphasis added]. *Tenet Hospitals, Ltd. v. De La Riva*, 351 S.W.3d 398, 403 (Tex.App.--El Paso 2011, no pet.). There is no authority suggesting that a plaintiff needs to show a particular defendant was the primary or supervening factor before the case can move forward into discovery.

In the second place, we see no compelling reason to consider expanding the fair summary standard to embrace a relative negligence inquiry absent further legislative directive, particularly at this pleading stage of litigation, in which discovery against the defendants is largely prohibited

9

by statute. *See Gonzalez*, 2016 WL 815449, at *6 (outlining discovery restrictions). Assigning blame among multiple defendants ordinarily involves resolving fact disputes, and we generally leave cause-in-fact issues for resolution on summary judgment or at trial unless the causal link between a defendant and the plaintiff's injury becomes too attenuated. *Tenet Hospitals, Ltd. v. Garcia*, 462 S.W.3d 299, 312 (Tex.App.--El Paso 2015, no pet.).

In short, Dr. Roddy's report adequately identifies the relative standards of care, breaches, and causal links between Carmona and her individual caretakers. Reversal on this ground would be improper.

Issue One (b) is overruled.

### *Causation*

In Issue One (a), Dr. Mendez-Martinez assets that Dr. Roddy's causation assessment is conclusory because there is nothing in the report that would establish that transferring Carmona to the ICU would have actually resulted in a different level of nursing care that could have altered the outcome in this case. We disagree.

"An expert report must provide a fair summary of the causal relationship between the failure of a health care provider to meet the standards of care and the injury, harm, or damages claimed." *De La Riva*, 351 S.W.3d at 403. [Citation omitted]. "A causal relationship is established by proof that the negligent act or omission was a substantial factor in bringing about the harm and that absent said act or omission, the harm would not have occurred." *Id*. We consider two factors in assessing whether a statement on causation is sufficient: (1) whether the expert established a logical, complete chain between a negligent act and the plaintiff's injury; and (2) whether the report gave the trial court sufficient medical details to allow the court to decide if the case was frivolous. *Clapp*, 394 S.W.3d at 258 (the "report must explain the basis of

10

the expert's statements and link his or her conclusions to the facts"); *Gonzalez*, 2016 WL 815449, at \*10-\*11 (level of detail needed to determine whether a case is frivolous will hinge on case-by-case assessment, including consideration of the complexity of medical issues and procedures involved).

Dr. Mendez-Martinez advances multiple attacks on both *Clapp* factors. We begin with his challenge to the report's level of detail. First, Dr. Mendez-Martinez argues that Dr. Roddy's report is insufficient as to causation because the report never actually delineates the differences between floor nurse monitoring responsibilities and ICU nurse monitoring responsibilities. For example, although Dr. Roddy asserts that ICU nurses would have monitored Carmona every thirty minutes, and although the facts as understood by Dr. Roddy show that the floor nurse did not monitor Carmona every thirty minutes, Dr. Roddy in his initial report also stated that the *floor nurse* had a duty to monitor Carmona every thirty minutes. Thus, by opining that the floor nurse breached a duty to monitor Carmona every thirty minutes, Dr. Roddy implicitly admitted that there was no difference in monitoring duties between the floor nurses and the ICU nurses, meaning that Dr. Mendez-Martinez's decision not to transfer Carmona from the floor into the ICU was ultimately immaterial.

This argument holds some appeal at first glance. By comparing language in the first report dealing with floor nurse monitoring with language in the second report dealing with ICU nurse monitoring, Dr. Mendez-Martinez suggests that the trial court should have concluded that ICU intervention would not have made a difference in this case because any nurse, regardless of assignment, should have been monitoring Carmona every thirty minutes based on her condition.

If the scope of our review only included the isolated provisions of Dr. Roddy's report dealing with the two nursing staffs' allegedly identical duty to monitor, reversal might be

11

appropriate, since then Dr. Mendez-Martinez's failure to transfer Carmona from one nursing unit to another would not have made a difference with respect to that issue. But we read expert reports as a whole, not in isolated provisions. When reading the provisions Dr. Mendez-Martinez cites in the context of the report as a whole, we believe Dr. Roddy's report can establish an adequate causal link under the fair summary standard because it also sets out other specialized duties and training ICU nurses have that could have made a difference in outcome.

Dr. Mendez-Martinez disagrees, complaining that while Dr. Roddy explained what special training ICU nurses receive to deal with patients, he failed to properly frame that training by detailing how it differed from the training floor nurses receive. He insists that because we cannot moor our analysis to that anchor point, and because we cannot draw inferences not explicitly stated in the report, the report is deficient for want of an adequate frame of reference and we must dismiss the case against him with prejudice. We concede that the report's delineation of standards among floor and ICU nurses may be less than precise, and Dr. Mendez-Martinez is correct that the Court must not draw impermissible inferences from an expert report. Still, the TMLA was not an attempt to graft strict pleading standards onto Texas medical malpractice cases, nor was it an invitation to abandon the traditional commonsense rules of textual interpretation when looking at an expert's report. The adequacy standard at the TMLA pleading stage is simple: courts are to look only at whether an expert report constitutes a "fair summary" of the issues at play, a summary that "include[s] an articulable, complete, and plausible explanation of how the alleged breaches led to the damages sustained[.]" *Garcia*, 462 S.W.3d at 308. We do not grade the report based on whether an expert stated those standards exhaustively or elegantly, or whether the expert recited the proper "magic words" necessary to ward off the specter of dismissal. *Bustillos v. Rowley*, 225 S.W.3d 122, 131 (Tex.App.--El Paso

12

2005, pet. denied). The question is not whether a report could have been more detailed, but rather, whether it needed to be more detailed. *Bustillos,* 225 S.W.3d at 131. As we held in *Gonzalez*, the level of detail needed to meet the fair summary standard will vary based on the type of negligence alleged. While plaintiffs need not drill down into every possible detail in every case in order to survive dismissal, a report in a case alleging negligence in the context of a complex surgery involving multiple doctors and nurses, for example, will necessarily require more details than a report dealing with more straightforward negligence allegations. *Gonzalez*, 2016 WL 815449, at *10-*11.

When we read these provisions outlining ICU nurse training and responsibilities contextually, we understand Dr. Roddy to say that the level of care Carmona would have received in ICU would have been different and more stringent by virtue of the ICU nurses' specialized training and round-the-clock care. Under the fair summary standard, that is enough to push this case into the discovery phase, since it articulates a difference that would arguably create a fact issue on whether Dr. Mendez-Martinez's actions would have made a difference that is ripe for later resolution.[1]

We next turn to the logical linkage element of causation. A plaintiff must link the defendant's alleged negligence to the injury suffered. A break in the logical chain between the negligent act and the injury renders the causation conclusions in a report insufficient. *See, e.g., Regent Health Care Ctr. of El Paso, L.P. v. Wallace*, 271 S.W.3d 434, 441 (Tex.App.--El Paso 2008, no pet.)(finding report insufficient due to analytical gap between worsening skin condition, fall, and patient's death); *Clark v. HCA, Inc.*, 210 S.W.3d 1, 11 (Tex.App.--El Paso 2005, no

---

[1] Because we find that the alleged failure to transfer to ICU ground presents an adequately detailed theory to allow the case to move forward, and because one adequate theory is enough to justify upholding denial of an expert report challenge, *see Certified EMS, Inc. v. Potts*, 392 S.W.3d 625, 631 (Tex. 2013), discussion of Dr. Roddy's alternative basis for liability—that Dr. Mendez-Martinez should have either stayed at Carmona's beside—is unnecessary to the resolution of this appeal. *See* TEX.R.APP.P. 47.1.

pet.)(plaintiff failed to link provider's improper use of Lovenox to compartment syndrome that led to loss of arm).

In his final point, Dr. Mendez-Martinez asserts even if Dr. Roddy articulated a difference in monitoring duties as between floor nurses and ICU nurses, there is a logical break in the chain at the final link because Dr. Roddy's report cannot establish that more frequent monitoring in the ICU would have made an actual difference in outcome. While acknowledging that we previously held failure to monitor can form the basis of a healthcare liability claim in *Bustillos*, 225 S.W.3d at 130-31, Dr. Mendez-Martinez maintains that this case is distinguishable from *Bustillos* because there, the expert specified that the deterioration in the patient's condition happened "incrementally," whereas in this case, Dr. Roddy did not specify how fast Carmona's condition would have deteriorated from 5 a.m. to when she was found at 7:14 a.m. This distinction is critical, Dr. Mendez-Martinez contends, because while more frequent ICU monitoring could have caught a slowly deteriorating condition, if Carmona's condition suddenly and rapidly crashed in the minutes before she was found without a pulse at 7:14 a.m., no amount of monitoring would have made a difference.

That sounds to us like an invitation to resolve an ultimate cause-in-fact question on the merits, not like an attack on whether Dr. Roddy's summary on causation is a fair one. In any event, *Bustillos*, a failure-to-monitor case, did not turn on whether the patient's symptoms worsened incrementally. Rather, the Court simply held that under the fair summary standard, a TMLA report was sufficient where the expert alleged that the hospital emergency department's failure to appropriately monitor a patient's vital signs, blood gases, and other medical signs beginning at 1:10 a.m. caused doctors to miss symptoms of treatable pulmonary edema that led to the patient's first cardiac arrest at 3:42 a.m. and ultimate arrest and death at 5:18 a.m.

14

*Bustillos,* 225 S.W.3d at 130-31. The general contours of the report here track the *Bustillos* report closely.

Here, Dr. Roddy's report meets the fair summary standard on causation by logically linking the alleged breach and the alleged harm step-by-step with enough medical detail to allow the trial court to decide that Carmona could state a claim under Texas law. Dr. Roddy explained that ICU nurses would be trained to know that atrial fibrillation can lead to heart failure if not treated correctly; they would know that heart failure leads to telltale changes in "vital signs, blood gases, and neurological status which the nurses are trained to recognize and report to the physician[;]" they would monitor patients in the ICU ward at least every thirty minutes; and had they monitored Carmona at least every thirty minutes between 5 a.m. and when she was found pulseless at 7:14 a.m., ICU nurses more likely than not would have caught any signs of deterioration in her condition and reported them to Dr. Mendez-Martinez, who could have altered Carmona's treatment to include rhythm-stabilizing drugs, beta blockers to control pulse, or cardioconversion that would have saved her life. Dr. Roddy also opined that the standard of care required Dr. Mendez-Martinez to transfer the patient to an ICU for more frequent monitoring once her heart rate increased to over 100 at 8 p.m. on May 7. By keeping her on the general care floor, Dr. Mendez-Martinez breached the standard of care, and as a result, his actions deprived her of the opportunity for potential intervention triggered by more frequent monitoring and were thus a substantial factor in Carmona's cardiac arrest and death.

Facially, the contentions laid out in Dr. Roddy's report provide an articulable, complete, and plausible path toward a cause of action against Dr. Mendez-Martinez. Whether the links in the logical chain are strong enough to support a liability finding against him is not a question to be resolved at the pleading stage. Dr. Roddy's report provides a fair summary of the plaintiff's

15

theory on causation.

Issue One (b) is overruled.

## CONCLUSION

The judgment of the trial court is affirmed.

April 22, 2016

YVONNE T. RODRIGUEZ, Justice

Before McClure, C.J., Rodriguez, and Hughes, JJ.