Opinion issued March 24, 2026



**In The**

# Court of Appeals

**For The**

# First District of Texas

_____

**NO. 01-24-00369-CV**
_____

**TOWNSEN MEMORIAL HOSPITAL, SOUTHEAST TEXAS MEDICAL VENTURES LLC D/B/A TOWNSEN MEMORIAL HOSPITAL, AND MARKUS BALONEY, RN, Appellants**

**V.**

**CEDRIC WHEELER, Appellee**

---

**On Appeal from the 11th District Court**
**Harris County, Texas**
**Trial Court Case No. 2021-74669**

---

**MEMORANDUM OPINION**

Dr. Bradford Mullin is a board-certified neurosurgeon and a fellow of the American College of Surgeons. He has been practicing spinal surgery for years.

When Dr. Mullin saw a patient named Cedric Wheeler, who had presented at the emergency room with serious bladder control problems, Dr. Mullin diagnosed the problem as modified cauda equina syndrome. Dr. Mullin recommended urgent surgical intervention and performed the surgery himself.

Dr. Mullin later concluded that Wheeler's cauda equina syndrome resulted from nursing negligence in a surgery that had taken place a few weeks earlier at Townsen Memorial Hospital. He provided an expert report to that effect in connection with Wheeler's suit against the hospital and one of the nurses. The hospital and the nurse argue that Dr. Mullin is not qualified to express that opinion. They also find fault with virtually every aspect of Dr. Mullin's opinion, whether relating to standard of care, breach, or causation. The trial court disagreed and denied the hospital and nurse's motion to dismiss.

We affirm.

## Background

According to his original petition, Wheeler was in a car accident in April 2020. He saw various medical providers and ultimately went to Townsen Memorial Hospital for spinal surgery later that year, where Dr. Juan Martin performed the surgery. Unfortunately, after being discharged in mid-December 2020, Wheeler began experiencing bladder control problems.

Over the holiday season, Wheeler moved to Ohio. Shortly after the new year, he went to the emergency room and complained that he "was retaining urine after voiding his bladder." Doctors ordered an MRI, which showed "advanced canal stenosis" at two lumbar vertebrae "due to large disc bulges" and "fluid collection in the laminectomy bed." Dr. Mullin examined Wheeler, diagnosed him with modified cauda equina syndrome, and recommended "urgent surgical intervention." Dr. Mullin then operated on Wheeler, removing bulging disc material and performing a "complete facetectomy" at the two vertebrae. Wheeler "requires the use of a cane to ambulate," and he "continues to be unable to adequately control the function of his bladder."

In November 2021, Wheeler sued multiple defendants, including appellants Townsen Memorial Hospital and Southeast Texas Medical Ventures LLC *d/b/a* Townsen Memorial Hospital (collectively, Townsen).[1] Wheeler's live petition alleged that Townsen's negligent acts and omissions included:

- Failure to evaluate and report Wheeler's postoperative signs and symptoms "from a nursing perspective";

- Failure to monitor and document Wheeler's fluid intake and urinary output;

- Failure to assess and document Wheeler's neurological conditions;

---

[1] Wheeler also sued Dr. Juan Martin, Juan J. Martin, M.D. PLLC, Minivasive Pain and Orthopedics, and Minivasive Pain Specialists, PLLC *d/b/a* Minivasive Pain & Orthopedics. None of these additional defendants is a party to this interlocutory appeal.

- Failure to initiate nursing assessments of postoperative voiding ability and characteristics;

- Failure to recognize and report signs and symptoms of cauda equina syndrome and report Wheeler's inability to independently ambulate;

- Failure to notify Wheeler's physician that he did not satisfy discharge criteria;

- Failure to appropriately communicate with physicians;

- Failure to initiate the chain of command;

- Failure to formulate, implement, and enforce policies and procedures; and

- Failure to properly train and supervise staff.

He also alleged that Townsen was both directly and vicariously liable. Wheeler served Townsen with an expert report and curriculum vitae from Dr. Mullin. *See* TEX. CIV. PRAC. & REM. CODE § 74.351(a).

Townsen objected to Dr. Mullin's qualifications to render an expert opinion and to the sufficiency of his conclusions regarding the standard of care, breach of that standard by Townsen, and causation. Following a hearing, the trial court sustained the objections but granted Wheeler a 30-day extension to cure deficiencies in the report. Dr. Mullin prepared an amended expert report. Townsen again objected to Dr. Mullin's qualifications and to the sufficiency of his conclusions. This time, the trial court overruled Townsen's objections to the report. Townsen did not immediately appeal this ruling.

4

As discovery progressed in the latter parts of 2022, some disagreement arose about who employed a nurse named Markus Baloney. Townsen took the position that Nurse Baloney was a "traveling nurse" or "agency nurse," not a Townsen employee. This question about Townsen's responsibility for the nurse's conduct led Wheeler to name Baloney as an additional defendant. Wheeler did not serve a new expert report on Baloney. Rather, he served Baloney with Dr. Mullin's amended report. Baloney did not object to the amended report.

Nearly eighteen months after Wheeler first named Baloney as an additional defendant, Townsen and Baloney moved to dismiss Wheeler's claims against them. In support of dismissal, Townsen re-urged the objections it had made to Dr. Mullin's amended report. Baloney argued that, as to him, the amended report was "no report" because the report did not identify Baloney or implicate his conduct. He argued that although the amended report mentioned "nurses" and "nursing staff," it did not identify any specific actions or omissions attributable to Baloney. He argued that Wheeler therefore failed to timely serve an expert report on him.

Wheeler responded to the motion to dismiss and moved for sanctions. In addition to arguing that Townsen and Baloney were wrong on the merits of their sufficiency challenge, he also argued that Baloney had waived the right to challenge the sufficiency of the report because he did not object within 21 days of being served with the report. He further argued that the defendants waived their right to seek

dismissal by "actively litigating this case on the merits for months (and in Townsen's case, years)," including by participating in discovery and mediation.

The trial court denied Townsen and Baloney's motion to dismiss but declined to award sanctions. This interlocutory appeal followed. *See id.* § 51.014(a)(9).

## Standard of Review and Governing Law

A health care liability claimant must timely serve an adequate expert report on each defendant. *Id.* § 74.351(a); *Bush v. Columbia Med. Ctr. of Arlington Subsidiary, L.P.*, 714 S.W.3d 536, 543 (Tex. 2025). An expert report is sufficient if it "provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." TEX. CIV. PRAC. & REM. CODE § 74.351(r)(6); *Bush*, 714 S.W.3d at 543. This is a "modest requirement at this early stage of litigation." *Bush*, 714 S.W.3d at 543.

The trial court may dismiss the lawsuit if the claimant's expert report is untimely or deficient. TEX. CIV. PRAC. & REM. CODE § 74.351(b); *Bush*, 714 S.W.3d at 543. The court may grant a motion that challenges a report's adequacy, but "only if it appears to the court, after hearing, that the report does not represent an objective good faith effort to comply with the definition of an expert report in Subsection (r)(6)." TEX. CIV. PRAC. & REM. CODE § 74.351(*l*); *Bush*, 714 S.W.3d at 543.

An expert report is a "good faith effort" if it (1) informs the defendant of the specific conduct called into question and (2) provides a basis for the trial court to conclude the claims have merit. *Bush*, 714 S.W.3d at 543 (quoting *Baty v. Futrell*, 543 S.W.3d 689, 693–94 (Tex. 2018)). Because a claimant must file an expert report early in the litigation at a "threshold stage of the case," courts measure the adequacy of the report using a "lenient standard." *Id.* (quoting *Scoresby v. Santillan*, 346 S.W.3d 546, 549 (Tex. 2011)). To be a good faith effort, the report must not "contain a material deficiency," and a report meets this standard if it "includes all the required elements, and . . . explains their connection to the defendant's conduct in a non-conclusory fashion." *Id.* (quoting *Samlowski v. Wooten*, 332 S.W.3d 404, 409–10 (Tex. 2011) (plurality op.)). Although magic words are not required, bare conclusions are not sufficient. *Id.* (quotation omitted).

The purpose of the expert report requirement is to "weed out frivolous malpractice claims in the early stages of litigation, not to dispose of potentially meritorious claims." *Abshire v. Christus Health Se. Tex.*, 563 S.W.3d 219, 223 (Tex. 2018) (per curiam). The report need not "marshal all the plaintiff's proof to avoid dismissal." *Bush*, 714 S.W.3d at 543–44 (quotation omitted); *accord Abshire*, 563 S.W.3d at 223.

We review a trial court's decision to deny a motion to dismiss based on the adequacy of an expert report for an abuse of discretion. *Bush*, 714 S.W.3d at 544.

We consider only the information contained within the four corners of the report. *Id.* Under this standard, "[c]lose calls must go to the trial court." *Id.* (quotation omitted); *E.D. ex rel. B.O. v. Tex. Health Care, P.L.L.C.*, 644 S.W.3d 660, 664 (Tex. 2022) (per curiam).

### Expert Qualifications

Townsen and Baloney first challenge Dr. Mullin's qualifications to provide an expert opinion on the standard of care and breach of that standard. Specifically, they argue that Dr. Mullin's expert report and CV do not establish that he has the knowledge, skill, experience, training, or education to opine on the appropriate care and treatment of a patient "by a health care institution and nurses."

To provide an expert opinion "regarding whether a health care provider departed from accepted standards of health care," the expert must be qualified to testify under Civil Practice and Remedies Code section 74.402. TEX. CIV. PRAC. & REM. CODE § 74.351(r)(5)(B); *Pankaj v. Hernandez*, 695 S.W.3d 900, 919 (Tex. App.—Houston [1st Dist.] 2024, no pet.) ("Only one who qualifies as an expert may satisfy the Texas Medical Liability Act's report requirement."). A person may qualify as an expert witness on whether a health care provider—such as a nurse— departed from accepted standards of care only if the person:

> (1)    is practicing health care in a field of practice that involves the same type of care or treatment as that delivered by the defendant health care provider, if the defendant health care provider is an

individual, at the time the testimony is given or was practicing that type of health care at the time the claim arose;

(2)      has knowledge of accepted standards of care for health care providers for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and

(3)      is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of health care.

TEX. CIV. PRAC. & REM. CODE § 74.402(b); *see also id.* § 74.001(a)(12)(A)(i) (defining "health care provider" to include "a registered nurse"). The expert's qualifications must appear in the report itself. *Olveda v. Sepulveda*, 141 S.W.3d 679, 683 (Tex. App.—San Antonio 2004, pet. denied).

A physician's medical degree alone does not qualify him to opine on the standard of care applicable to nurses. *Pankaj*, 695 S.W.3d at 920. But a physician may qualify as an expert on this standard if he "shows he is familiar with the standard of care for nurses as to the care or treatment of the medical condition in question, including through the supervision or training of nurses in this context." *Id.*; *Harvey v. Kindred Healthcare Operating, Inc.*, 578 S.W.3d 638, 647 (Tex. App.—Houston [14th Dist.] 2019, no pet.) ("[W]hen a physician states that she is familiar with the standard of care and requirements for nonphysician healthcare providers and that she has worked with, interacted with, and supervised such healthcare providers, she is qualified to opine regarding whether the healthcare provider departed from the accepted standards of care.").

9

In the amended expert report, Dr. Mullin, a board-certified neurosurgeon, addressed his familiarity with the standard of care for patients like Wheeler:

> I have practiced neurosurgery for over 25 years. I am well familiar with patients like or similar to Cedric Wheeler. I have evaluated and performed surgeries on patients presenting like Mr. Wheeler in December 2020. I am also familiar with the postoperative care required for patients like Mr. Wheeler.
>
> As a part of my regular practice as a neurosurgeon in clinical and hospital settings over the past 25 years and as the previous Director of Neurosurgery in the Department of Surgery and Director of the Neurosurgery ICU, I am responsible for and routinely supervise, direct, and collaborate with nurses in the postoperative care of patients who have undergone decompressive laminectomies of the lumbar spine. In this respect, I am familiar with the standard of care for nurses in this setting and have expectations as to their care, evaluation, intervention, and communication in such cases.

Additionally, Dr. Mullin himself performed spinal surgery on Wheeler following the surgery that he received at Townsen. This surgery involved a "complete facetectomy" and extension "of the lamina." Dr. Mullin also examined Wheeler post-surgery.

Based on Dr. Mullin's amended report, the trial court reasonably could have determined that his supervision of and collaboration with nurses during postoperative care made him qualified to render an expert opinion on the standard of care for nurses and health care providers. *See Pankaj*, 695 S.W.3d at 921 ("While a physician is not qualified to opine on the standard of care applicable to nurses in every instance, a physician is qualified to do so when his interaction with nurses,

including the supervision and training of them, has familiarized him with the standard of care."); *Baylor Med. Ctr. at Waxahachie v. Wallace*, 278 S.W.3d 552, 559 (Tex. App.—Dallas 2009, no pet.) (holding that trial court did not abuse its discretion in concluding medical expert was qualified when expert report included statement that expert had worked with nurses, nurse practitioners, physician's assistants, and physicians and was "familiar with the standards of care that apply to such health care providers in similar situations"). We hold that the trial court did not abuse its discretion by concluding Dr. Mullin was qualified to render an opinion on the standard of care as to Townsen and Baloney.

We overrule Townsen and Baloney's first issue.

**Components of Expert Report**

Townsen and Baloney challenge the sufficiency of every aspect of Dr. Mullin's amended expert report: standard of care, breach, and causation. Additionally, Baloney argues that because the amended report did not mention him or implicate his conduct, it was "no report" as to him, and therefore Wheeler did not timely serve him with an expert report.

**A.     Standard of Care and Breach of that Standard**

In articulating the standard of care and how the defendant allegedly breached that standard, the expert report "must set forth specific information about what the defendant should have done differently;" that is, "what care was expected, but not

11

given." *E.D.*, 644 S.W.3d at 664 (quoting *Abshire*, 563 S.W.3d at 226). A hospital's standard of care is what an ordinarily prudent hospital would do under the same or similar circumstances. *Bush*, 714 S.W.3d at 544–45. "It is not sufficient for an expert to simply state that he or she knows the standard of care and concludes it was [or was not] met." *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 880 (Tex. 2001) (quotation omitted).

After providing information about his background and training, Dr. Mullin opined concerning the general postoperative standard of care applicable to nurses:

> The standard of care requires and it is my expectation that nurses consistently evaluate the neurologic status of the postoperative patient, including evaluation of bowel and bladder function and ability to ambulate independently. The standard of care also requires, and I further expect, that the nurses document the results of such evaluations and report said results to myself for my patients or another treating physician during the course of postoperative care. If a treating physician fails to intervene upon receiving a report of such a postoperative patient's abnormal neurologic status[,] the standard of care requires, and I expect, the nurses to initiate the chain of command to ensure that any neurologic symptoms are adequately addressed prior to discharge. The standard of care also requires and it is my expectation that nurses fully understand the potential consequences of not assessing the patient and likewise not reporting the abnormal findings.

Dr. Mullin's expert report described the care that Wheeler received following the car accident, including the MRI results, Dr. Martin's recommendation, the surgery at Townsen, Wheeler's postoperative care and discharge from Townsen, Wheeler's medical care in Ohio, Dr. Mullin's evaluation of Wheeler and the surgery that he

performed, Wheeler's postoperative care following his second surgery, and Wheeler's lingering medical problems.

Dr. Mullin opined on the standard of care applicable to a neurosurgeon evaluating and treating a patient like Wheeler. He then provided a more specific opinion about the nursing standard of care:

> [T]he standards of care applicable to nurses and neurosurgeons requires close postoperative observation by the neurosurgeon and the nursing staff and communication between them to ensure that appropriate discharge criteria, such as the return of bowel and bladder function and the ability to ambulate independently, are met before releasing the patient.
>
> More specifically, the nursing standard of care requires nurses to evaluate the patient to determine if the patient's bowel and bladder function and ability to independently ambulate have returned and to report the results to a treating physician. If the nurses have reported to the treating physician that the patient's bowel and bladder function and ability to independently ambulate have not returned and the treating physician fails to intervene and/or attempts to discharge the patient, the nursing standard of care further requires nurses to initiate the chain of command to ensure proper evaluation of the above-stated symptoms by a physician and intervention consistent with the physician standard of care before discharge. This standard of care does not require nurses to practice medicine. Instead, it recognizes that physicians rely upon nurses to observe the patient, report and document both the presence and absence of symptoms, and make certain the presence or absence of symptoms is properly evaluated and acted upon by a physician. This standard of care exists because if the patient develops the neurologic sequelae to the spinal cord compression, such as inability to confirm bowel and bladder function, and the inability to ambulate independently, and such are not addressed, the neurologic injury will likely progress and become permanent.

13

Dr. Mullin opined that "the nursing staff violated the standard of care in failing to evaluate and report to Dr. Martin Mr. Wheeler's failure to regain bowel and bladder function and ability to independently ambulate." He further stated that had Wheeler's failure to regain bowel and bladder function and ability to ambulate independently been reported to Dr. Martin and not addressed, "the nursing staff violated the standard of care in not invoking the chain of command to ensure such symptoms were evaluated by a physician."

The expert report explains how Dr. Mullin knows the standard of care, states that standard, and then provides his opinion on how Townsen's nursing staff breached the standard. His report satisfies the "lenient standard" laid out by the Texas Supreme Court because it adequately articulates what the court requires: specific information about what the nursing staff should have done differently, "that is, what care was expected, but not given." *See Bush*, 714 S.W.3d at 544 (quotation omitted).

Townsen and Baloney argue that this case is analogous to *Columbia Valley Healthcare System, L.P. v. Zamarripa*, 526 S.W.3d 453, 461 (Tex. 2017), where the Texas Supreme Court held that expert reports were deficient because they required nursing staff to make a medical determination. In *Zamarripa*, the expert reports opined that hospital nursing staff breached the standard of care by, among other things, allowing the patient to be transferred to another facility when she was in

14

preterm labor and this breach caused the patient's death because she was in an ambulance when she began bleeding and could not undergo an emergency c-section. *Id.* at 458. The Texas Supreme Court determined that the expert reports were deficient because a doctor—not the hospital—ordered the patient's transfer, and the reports did not explain how the hospital permitted the transfer or "had any say in the matter." *Id.* at 461. According to Townsen and Baloney, Dr. Mullin's report is similar to the deficient reports in *Zamarripa* because it "requires nurses to ensure that *physicians* comply with the physician standard of care, without explaining what medical knowledge, training, or experience would allow them to do so."

This argument does not fairly depict the report. Dr. Mullin's report describes the standard of care for a neurosurgeon in evaluating a patient like Wheeler, performing surgeries such as decompressive laminectomies, and observing the patient post-operation. The relevant standards of care "requires close postoperative observation" by both neurosurgeons and nursing staff and "communication between them to ensure that appropriate discharge criteria, such as the return of bowel and bladder function and the ability to ambulate independently, are met before releasing the patient." The report then states what nurses should do: nurses should evaluate the patient to determine if bowel and bladder function and the ability to ambulate independently have returned, report this information to the treating physician, and initiate the chain of command if the physician does not intervene or attempts to

15

discharge the patient. This standard of care "does not require nurses to practice medicine," but instead "recognizes that physicians rely upon nurses to observe the patient, report and document both the presence and absence of symptoms, and make certain the presence or absence of symptoms is properly evaluated and acted upon by a physician."

The Texas Supreme Court distinguished *Zamarripa* in *Bush*, noting that the expert report in *Bush* "does not call for the Hospital to countermand a physician's decisions" but instead "opines that the Hospital could have changed the outcome by adopting and enforcing policies . . . that would have communicated vital diagnostic information to [the patient's] doctors." *See* 714 S.W.3d at 549. Dr. Mullin's report resembles the report in *Bush* more than it resembles the one in *Zamarripa*: it opines that the nursing staff should evaluate certain items and report those observations to physicians, going up the chain of command if necessary, so accurate determinations about the patient's suitability for discharge can be made. The deficiencies that were present in the *Zamarripa* expert reports are not present in Dr. Mullin's report.

Townsen and Baloney also complain that Dr. Mullin's report "fails to explain the basis of his statements and link his conclusions to the facts of the case." Instead, it "attempts to rely completely on Mr. Wheeler's unverified statements to form the basis of his version of events," and Townsen and Baloney dispute the truthfulness of Wheeler's account. They go on to say that the report "relies on a chain of

16

unsubstantiated assumptions." They conclude that the report does not inform them of the conduct complained of, and that it does not give reason to believe that the claims have merit.

A health care liability claimant is not required "to present evidence in the report as if it were actually litigating the merits." *Id.* at 544 (quoting *E.D.*, 644 S.W.3d at 667). An expert report can be adequate for purposes of surviving a section 74.351 challenge even if it does not meet the requirements of evidence offered in a summary judgment proceeding or at trial. *Id.* (quoting *Miller v. JSC Lake Highlands Operations, LP*, 536 S.W.3d 510, 517 (Tex. 2017) (per curiam)); *Gannon v. Wyche*, 321 S.W.3d 881, 888–93 (Tex. App.—Houston [14th Dist.] 2010, pet. denied) (rejecting challenge to expert report based on report's reliance on unsworn and unauthenticated statement by patient's mother). At this stage of the proceeding, Dr. Mullin's reliance on Wheeler's unverified statement concerning what he told Townsen nursing staff about his bowel and bladder function is permissible.

We further disagree that Dr. Mullin's expert report does not explain the basis of his statements or link his conclusions to the facts. He explains that following surgeries such as laminectomies, the standard of care requires nurses to "consistently evaluate the neurologic status of the postoperative patient, including evaluation of bowel and bladder function and ability to ambulate independently," "document the results of such evaluations," report the results to the treating physician during

postoperative care, and initiate the chain of command if the treating physician "fails to intervene upon receiving a report of such a postoperative patient's abnormal neurologic status." Dr. Mullin believed, based on Wheeler's statement and his medical records, that Townsen's nursing staff breached the standard of care by not properly evaluating his neurological functioning or reporting findings from any evaluations:

> Mr. Wheeler was admitted to the PACU following surgery. He was then released from the PACU and ultimately discharged the next day. It is not clear from the records whether Dr. Martin ever actually saw Mr. Wheeler postoperatively. The statement from Mr. Wheeler indicates Dr. Martin did not. It further indicates that Mr. Wheeler's bowel function, bladder function, and ability to ambulate independently did not return prior to discharge from Townsen Memorial Hospital and that he informed multiple nurses on multiple occasions of these conditions. Furthermore, there is no affirmative indication in the records that anyone noted a return of bowel and/or bladder function or the ability to ambulate independently. Nor is there any indication of any conversation between the nursing staff and Dr. Martin regarding the same. And it seems clear that the nursing staff did not initiate the chain of command prior to discharge.

At the end of his report, Dr. Mullin concluded that the nursing staff violated the standard of care by "failing to evaluate and report to Dr. Martin Mr. Wheeler's failure to regain bowel and bladder function and ability to independently ambulate," and had the staff reported these findings to Dr. Martin and the findings went unaddressed, they violated the standard of care by "not invoking the chain of command to ensure such symptoms were evaluated by a physician."

18

Dr. Mullin's expert report sets out specific information about what Townsen should have done differently: it explains "what care was expected, but not given."[2] *See E.D.*, 644 S.W.3d at 664 (quotation omitted); *see also Abshire*, 563 S.W.3d at 227 ("Although the reports do not designate a specific documentary procedure [for recording a patient's medical history and symptoms] that should have been used, such detail is simply not required at this stage of the proceedings.") (quotation omitted). We therefore conclude that the expert report adequately addressed the standard of care and breach of that standard. *See Bush*, 714 S.W.3d at 543. We now turn to whether the expert report adequately addresses causation.

## B.    Causation

Townsen and Baloney attack Dr. Mullin's causation opinion as impermissibly conclusory. They say that the report requires the courts to assume that any nurse's request for intervention "would have caused Dr. Martin or another physician to delay

---

[2]    The Texas Supreme Court has repeatedly stated that "[t]he ultimate evidentiary value of the opinions proffered" by the expert "is a matter to be determined at summary judgment and beyond." *Bush v. Columbia Med. Ctr. of Arlington Subsidiary, L.P.*, 714 S.W.3d 536, 544 (Tex. 2025) (quoting *E.D. ex rel. B.O. v. Tex. Health Care, P.L.L.C.*, 644 S.W.3d 660, 667 (Tex. 2022) (per curiam)). "[W]hether the expert's explanation is credible, reasonable, or believable is irrelevant; those questions are to be litigated later in the proceedings." *Id.* at 545. Wheeler's statement about what occurred during his postoperative care might be incorrect. Dr. Mullin might be wrong about what the standard of care requires of nurses in this situation. But those are matters for summary judgment or trial, not the expert report stage. *See id.* at 551; *Gannon v. Wyche*, 321 S.W.3d 881, 892 (Tex. App.—Houston [14th Dist.] 2010, pet. denied) ("[T]he credibility and weight to be given to the facts supporting the expert's opinion is an issue for trial.").

19

Mr. Wheeler's discharge. Dr. Mullin[] does not explain why this would happen." "Moreover, Dr. Mullin[] does not address how long after initial neurological sequelae until symptoms became permanent: is it a day? a week? a month?" They argue that due to these deficiencies, the expert report fails to show how the nursing staff's alleged breach of the standard of care proximately caused Wheeler's injuries.

With respect to causation, the expert must "explain how and why the alleged negligence caused the injury in question." *Abshire*, 563 S.W.3d at 224 (quotation omitted). The expert must do more than make a conclusory statement of causation; "instead, the expert must explain the basis of his statements and link conclusions to specific facts." *Id.* However, the expert "need not prove the entire case or account for every known fact." *Id.* The report is sufficient if it makes "a good-faith effort to explain, factually, how proximate cause is going to be proven." *Id.* (quoting *Zamarripa*, 526 S.W.3d at 460); *Walker v. Baptist St. Anthony's Hosp.*, 703 S.W.3d 339, 343 (Tex. 2024) (per curiam) ("To meet the standard of good-faith effort as to causation, a report need not use magic words like 'proximately caused,' but it must 'explain, to a reasonable degree, how and why the breach caused the injury.'") (quoting *Jelinek v. Casas*, 328 S.W.3d 526, 539–40 (Tex. 2010)).

Courts must determine whether the expert has explained how the alleged negligent conduct caused the injury, "not whether the expert has *proved* causation." *Bush*, 714 S.W.3d at 544. Our role "is not to weigh the report's credibility," and our

"disagreement with the expert's opinion does not render the expert report conclusory." *Abshire*, 563 S.W.3d at 226; *E.D.*, 644 S.W.3d at 664 ("At this preliminary stage of the litigation, whether the expert's explanations are 'believable' is not relevant to the analysis of whether the expert's opinion constitutes a *good-faith effort* to comply with the Act.") (quotation omitted). The "fair summary" requirement "is not an evidentiary standard," and courts "do not require a claimant to present evidence in the report as if it were actually litigating the merits." *E.D.*, 644 S.W.3d at 667 (quotation omitted). The "ultimate evidentiary value" of the expert's opinions—whether a causal connection exists between the defendant's allegedly negligent acts or omissions and the claimant's injuries—is "a matter to be determined at summary judgment and beyond." *Bush*, 714 S.W.3d at 544 (quoting *E.D.*, 644 S.W.3d at 667).

In the context of explaining the standard of care relevant to Dr. Martin, Dr. Mullin explained how cauda equina syndrome can develop and what injuries can occur following that development:

> The standard of care for a neurosurgeon evaluating a patient like or similar to Mr. Wheeler and undertaking surgical decompressive laminectomies and/or instrumentations of the lumbar spine is to understand that spinal canal stenosis and disk herniation in the lumbar spine can result in Cauda Equina Syndrome, or permanent neurologic injury to the nerves referred to as Cauda Equina, which could result in injury to bowel and bladder function, sexual function, the ability to ambulate, etc. . . . Failure to remove large, herniated disc material in the lumbar spine during surgery risks the foreseeable development of Cauda Equina Syndrome in the patient. The principal symptoms

21

associated with Cauda Equina Syndrome are the following: (1) Urinary retention; (2) urinary or fecal incontinence; (3) saddle paresthesia; (4) sciatica; and (5) sexual dysfunction. When these symptoms begin to develop, addressing the compression on the nerves causing them in a timely manner is critical. As the symptoms progress, the injury caused by compression of these nerves becomes permanent.

After describing the standard of care for nursing staff, which we addressed above, Dr. Mullin explained why the standard exists: "[I]f the patient develops the neurologic sequelae to the spinal cord compression, such as inability to confirm bowel and bladder function, and the inability to ambulate independently, and such are not addressed, the neurologic injury will likely progress and become permanent."

Dr. Mullin concluded that the nursing staff breached the standard of care, causing Wheeler's injuries:

Had the nursing staff identified and reported Mr. Wheeler's failure to regain bowel and bladder function and inability to ambulate independently, in reasonable medical probability, Mr. Wheeler's injuries likely would not have occurred because the evaluation and addressing of these postoperative symptoms by a physician following the applicable standard of care would have led to surgical intervention to [remove] the extruded disc material and thus prevented the development of [Cauda] Equina Syndrome.

He opined that the nurses' breach of the standard of care "constitute[d] negligence as the term is defined and were each a contributing factor and a proximate cause of Mr. Wheeler's injury."

Wheeler disagrees with Townsen and Baloney's contention that Dr. Mullin's causation opinion is conclusory: "Put simply, if the nurses had timely reported

22

Wheeler's symptoms to a physician following the applicable standard of care, surgical intervention would have occurred to prevent the development of Wheeler's injuries, i.e. Cauda Equina Syndrome." We agree with Wheeler. Dr. Mullin explained the risk of "foreseeable development of Cauda Equina Syndrome" as a result of failure to remove large, herniated disc material in the lumbar spine during surgery. He indicated that if not addressed, such a neurologic injury "will likely progress and become permanent."

There is nothing conclusory about Dr. Mullin's opinion about causation, namely the statement that the injuries "likely would not have occurred" if the nursing staff had identified and reported what they allegedly failed to identify and report. As Wheeler comments on appeal, "had the nurses done their job, Wheeler's postoperative symptoms would have been timely reported by the nursing staff to a treating physician, and such reporting would have led to further surgical intervention to remove the extruded disc material, thereby preventing the development of Wheeler's Cauda Equina Syndrome."

Nor did the report need to name an exact moment in time when the injuries became permanent. Instead, the report merely needed to provide a straightforward link between the alleged breach of the standard of care and the injuries. *See Abshire*, 563 S.W.3d at 225 ("[T]he report draws a line directly from the nurses' failure to properly document Abshire's OI and back pain, to a delay in diagnosis and proper

treatment (imaging of her back and spinal fusion), to the ultimate injury (paraplegia)."). It did so. *See Walker*, 703 S.W.3d at 343–44 (rejecting challenge to causation opinion and reiterating that the purpose of the expert report is to weed out frivolous claims, not potentially meritorious ones). We conclude that Dr. Mullin's expert report "explain[ed] how and why the alleged negligence caused the injury in question," explained the basis for his conclusions, and linked his conclusions to specific facts. *See Abshire*, 563 S.W.3d at 224 (quotation omitted).

We hold that the trial court did not err by denying Townsen's motion to dismiss Wheeler's claims.[3]

## C. Conduct of Markus Baloney

Townsen and Baloney further argue that the expert report did not name Baloney or implicate his conduct. Therefore, the report is "no report" as to him, and the trial court should have dismissed Wheeler's claims against him.

Section 74.351(a) requires "[e]ach defendant physician or health care provider *whose conduct is implicated in a report*" to file and serve any objection to the sufficiency of the report within 21 days of service of the report or filing of the defendant's answer." TEX. CIV. PRAC. & REM. CODE § 74.351(a) (emphasis added).

---

[3] In Townsen's fifth appellate issue, it argues that it did not waive its right to seek dismissal through its litigation conduct. Because we conclude that Dr. Mullin's expert report was sufficient as to Townsen and the trial court did not err by denying Townsen's motion to dismiss on this basis, we need not address Townsen's waiver argument.

If the defendant does not timely object, "all objections are waived." *Id.*; *Ogletree v. Matthews*, 262 S.W.3d 316, 321–22 (Tex. 2007).

To qualify as a report as to a particular defendant, the report need not refer to the defendant by name, but the report must implicate the defendant's conduct. *Sinha v. Thurston*, 373 S.W.3d 795, 800 (Tex. App.—Houston [14th Dist.] 2012, no pet.). An expert report does not implicate a particular health care provider merely because the provider is a defendant in the lawsuit. *Id.* "An expert's bare, collectivized accusations of negligence against multiple defendants are insufficient to meet the [expert report] requirements; the expert must either individually distinguish the defendants from one another or else explain why all defendants are subject to the same standard of care." *Golucke v. Lopez*, 658 S.W.3d 686, 697 (Tex. App.—El Paso 2022, no pet.) (quoting *Mendez-Martinez v. Carmona*, 510 S.W.3d 600, 606 (Tex. App.—El Paso 2016, no pet.)). When a plaintiff sues multiple defendants, the expert report must set out the standards of care applicable to each defendant and explain how the defendants' respective breaches of the standards of care are causally linked to the plaintiff's injury. *Id.* (quoting *Mendez-Martinez*, 510 S.W.3d at 606).

As we have already discussed, Dr. Mullin's expert report adequately sets out the standard of care relevant to the "nursing staff" caring for Wheeler, how the nursing staff allegedly breached the standard of care, and how the alleged breaches caused Wheeler's injuries. It is undisputed that Baloney was a nurse involved in

Wheeler's postoperative care at Townsen. Although the expert report does not mention Baloney by name, the report does address conduct of the nursing staff, and therefore the report implicates Baloney's conduct. *See Sinha*, 373 S.W.3d at 800. As a result, he was required to file and serve any objections to the sufficiency of the expert report within 21 days of service of the report or his answer. TEX. CIV. PRAC. & REM. CODE § 74.351(a). Because he did not, he waived any objection to the sufficiency of the report, and the trial court did not err by denying his motion to dismiss. *Id.*; *Ogletree*, 262 S.W.3d at 322.

## Appellate Sanctions

Finally, Wheeler asserts that Townsen and Baloney have pursued a frivolous appeal and requests that we impose damages under Rule of Appellate Procedure 45. *See* TEX. R. APP. P. 45 ("If the court of appeals determines that an appeal is frivolous, it may . . . award each prevailing party just damages."); *Smith v. Brown*, 51 S.W.3d 376, 381 (Tex. App.—Houston [1st Dist.] 2001, pet. denied) (exercising "prudence and caution," using "careful deliberation," and considering "the record from the viewpoint of the advocate" to determine whether "he had reasonable grounds to believe the case could be reversed" when applying Rule 45).

As support for his request for damages, Wheeler cites nine instances from a six-year period where counsel for Townsen and Baloney allegedly pursued an unsuccessful appeal from denial of a dismissal motion under section 74.351.

26

Wheeler further cites almost thirty other cases—at the trial court level—in which counsel allegedly "regularly serves objections to the sufficiency of expert reports under section 74.351 with little apparent success."

These data points are not enough to persuade us to find a frivolous appeal. Although we conclude that Townsen and Baloney's appellate arguments are not meritorious, their arguments have not crossed the line into the territory of the frivolous.

We overrule Wheeler's request to impose damages under Rule 45.

## Conclusion

We affirm the trial court's order denying Townsen and Baloney's motion to dismiss.

David Gunn
Justice

Panel consists of Justices Rivas-Molloy, Gunn, and Caughey.